# HAVEN & WHITE
## v.
# JOHN WAKEFIELD et al.

| | |
|---|---|
| 39 | 509 |
| 22a | 89 |
| 39 | 509 |
| 37a | 415 |
| 39 | 509 |
| 40a | 228 |
| 39 | 509 |
| 62a | 533 |
| 39 | 509 |
| 213 | 6533 |
| 213 | 6534 |

1. LEASE—*what constitutes.* It is not essential to constitute a valid lease, that the building which is the subject of the contract should be erected at the time the lease is made, or that the lessor should at that time be the owner of the ground upon which the building is to be placed.

' 2. So where a party agreed to procure a lot of ground and erect a house thereon, which another was to rent at a stipulated price per year, and for a fixed term of years, with the privilege of purchasing the premises within a certain time during the term, the contract providing that in case of a purchase, the money which had been previously paid as rent should be applied on the purchase-price of the land, it was *held,* that the contract constituted a lease, binding the lessee for the payment of the annual rents, with the right to elect to change the lease into a purchase.

3. JURISDICTION *in chancery and at law.* Where the same person is a member of two partnership firms, one firm cannot sue the other at law, because a party cannot be both plaintiff and defendant in the same suit—he cannot sue himself; and in an action at law between partnership firms, the right of recovery and the liability both being joint, the recovery must be by all the plaintiffs and against all the defendants.

4. In such case, although the subject-matter of the controversy is properly cognizable in a court of law, as for rents accrued under a lease by one firm to the other, to prevent a failure of justice equity will take jurisdiction and afford an adequate remedy.

5. CONTRACTS—*waiver of non-performance by one of the parties.* Where a lessor of premises agreed to erect and complete a building thereon, within a specified time, but neglected to do so within the time agreed upon, if the lessee enters into possession of the building, under the contract, while it is in an unfinished condition, he thereby waives any right he may have had to be released from the covenants on his part, by reason of the failure of the lessor to complete the building within the proper time.

6. LESSOR AND LESSEE—*damages to lessee for failure of the lessor to complete a building in proper time.* If, however, the lessee has suffered damage, by reason of the failure of the lessor to complete the building within the time agreed upon, such damage may be recouped in a proceeding for a recovery of the rent, to the extent of the rent; and if the damage exceeds that amount, the excess may be recovered over in the same proceeding.

7. MEASURE OF DAMAGES, *in such case.* In this case, the building which was to be erected by the lessor, was designed to be used by the lessee for the purpose of storing broom-corn, and the manufacture of brooms therefrom.

By reason of the failure of the lessor to complete the building in proper time, the lessee was obliged to use it in an unfinished condition, for the storing of the crop of broom brush he had raised that season, and, the building not affording safe storage therefor, the brush was seriously injured by the weather. And by reason of the non-completion of the building, the lessee was delayed in cutting and housing his crop in proper season, and a large portion of it suffered injury from frost, rain and other action of the weather. This damage to the broom-corn was regarded the immediate result of the failure of the lessor to have the house in readiness at the time agreed upon. Any damage the lessee may have sustained by the failure to complete the building, would be proximate damages growing out of the breach of contract.

8. Purely speculative damages, however, such as probable profits, would not be considered, but a reccovery should be confined to such damages as result as an immediate consequence of the breach of the contract.

Appeal from the Circuit Court of St. Clair county.

This was a suit in chancery instituted in the court below, by John Wakefield and several others, partners, and with Otis Haven, composing a firm under the name and style of the "Summerfield Building company," against the same Otis Haven and Charles W. White, partners, composing another firm, engaged in the business of raising broom-corn, and the manufacture of brooms therefrom.

The object of the bill was to recover from the defendants the rents which were alleged to have accrued under a lease of certain premises to them by the complainants.

The relations of the parties will appear by the following statement: The complainant, John Wakefield, with Otis Haven, and several other persons, entered into a copartnership about the 22d of August, 1854, for the purpose of building houses and making improvements in the town of Summerfield, in St. Clair county, the style of the firm being the "Summerfield Building company."

About the same time Otis Haven and Charles W. White, who were partners in the business of raising broom-corn, and manufacturing brooms therefrom, submitted to the "Summerfield Building company" the following proposition:

" *To the Summerfield Building Company*,

" GENTLEMEN : The undersigned propose to you as follows :

" 1. That if your company will build in the town of Summerfield, as near the depot as convenient and lots can be procured, a house for the purpose of a broom factory, or any other proper use, should it be necessary to change the business, one hundred feet long, fifty feet wide and three stories high, according to plan herewith submitted, to cost no more than three thousand dollars, ground included ; we will rent the same of your company for five consecutive years, and pay annually a yearly rent of six hundred dollars or twenty per cent. on cost of lots and building.

" 2. The foregoing proposition is made on condition that, if we choose to do so, we shall have privilege at any time within two years from the day we occupy it, to pay to the company for the property, lots and buildings, the original cost with ten per cent. added to such cost, reckoning interest from the first outlay, in which case the company on payment of cost and interest shall deed the property to us.

" 3. The foregoing is also offered on the further condition that the building contemplated shall be erected with all convenient dispatch, and if possible finished within six weeks from this date (at least so as to begin to receive the stock in shelter).

" OTIS HAVEN,<br>" CHAS. W. WHITE."

This proposition was accepted by the building company, who proceeded to procure a lot and to erect a building thereon. About the 10th of October, 1856, Haven & White took possession of the property, the building being still in an unfinished condition, and commenced using it for the purpose of storing broom-corn and manufacturing brooms. After the lapse of a year from the time the defendants took possession, on the 26th of March, 1858, the complainants filed their bill for the recovery of the rent which had accrued, alleging that Haven & White had not in the mean time purchased the premises.

The defendants answered the bill, and, among other things, insisted that it was insufficient in law to entitle the complainants to the relief sought, because:

1. The agreement relied upon, as set out in the bill, was not a lease, and did not constitute a letting of the house, but was only an agreement for a lease binding plaintiffs upon certain conditions, which might never be performed, to lease a house which was to be thereafter built upon ground thereafter to be purchased; the subject of the contract not being in existence there could be no present letting.

2. By the complainants' own showing, their suit was premature, having been instituted before a right of action had accrued, the fact being, as appeared from the complainants' own showing, that the plaintiffs had two years in which to determine whether they would purchase the property by paying the original cost with ten per cent. interest from first outlay, which two years had not elapsed when the bill was filed, the 26th of March, 1858, and it is not alleged in the bill that the plaintiffs occupied the house before October, 1856.

The defendants at the same time filed their cross-bill, in which they represented that they had become partners for the purpose of growing and harvesting broom-corn, and manufacturing brooms, and in the prosecution of the business they had rented a large farm near the town of Summerfield, for the term of five years from the 10th of April, 1856, at a yearly rent of $600, and in the spring planted a crop of about seventy acres of broom-corn. In the month of August following, when the ·defendants were about to erect a building on the farm for the purpose of storing and manufacturing the corn when matured, they made the proposition before referred to, in pursuance of which the complainants in the original bill undertook to erect a building in the town of Summerfield, for the purpose indicated, within the time therein specified, and by reason of this arrangement the defendants, Haven & White, abandoned the idea of erecting a building on the farm, as they had intended.

The crop of broom-corn having matured, and it being necessary, in order to save it from loss, they commenced cutting the

same about the first of October, 1856 ; and about the sixth of that month, the company having raised one story of the house and partly inclosed the same, though not in such a manner as to afford a sufficient shelter for the corn, having no place else to store the same, and wishing to save the same if possible, commenced putting their corn in the house so partially erected, the hands continuing from time to time to work on the building. They continued to cut and store their corn in the building until some time in the month of December following ; up to which time they had stored in the building, although it was not yet in a condition to shelter and protect the same, about twenty-five tons of their corn of the value of $80 per ton. That on account of having to cut and store their corn so late in the season, they were put to much extra expense, which they would not have been subjected to but for the failure of the company to build the house as agreed, and as they had a right to expect would have been done ; and that by the non-completion of the house as agreed, the plaintiffs were compelled to and did leave standing and uncut in the field five tons of corn of the value of $80 per ton, which proved an entire loss ; and that, by the company having failed, during the winter of 1856, to complete the house so that the plaintiffs could have manufactured brooms therein, they were compelled to permit their corn to remain in bulk until about the first of March, 1857, by which time, by reason of the house having furnished so insufficient a shelter, the corn stored had become so damaged as to render the same almost if not quite valueless ; yet, with a hope of making something out of the corn if possible, the plaintiffs, in the spring of 1857, at great expense, procured machinery and labor and caused the seed to be stripped from the corn preparatory to manufacturing the same into brooms ; and, although the house was yet so unfinished as to render it unsuitable for a broom factory, as best they could made out of the best of the corn sixty dozen brooms, which, on account of the damaged condition of the corn, proved unmerchantable, and would not sell for enough to pay for making the same ; finding which, the plaintiffs stopped manufacturing the same, and, having no other place to store that which was left,

permitted it to remain in the house; and, still hoping to realize something from the same, and to that end only (for they had become satisfied the house would not be completed as contemplated by the agreement), planted a crop, in the spring of 1857, of forty acres, their object being to grow enough only to work up the damaged corn by mixing it with the new crop. That, out of the second crop and a portion of the best of the damaged corn, they made eight or nine hundred dozen of brooms, which, if they had been made out of such corn as was commonly used, would have been worth $2.25 per dozen, but, by reason of using the damaged corn, they were only worth, and they only realized on an average, $1.75 per dozen; that the use of the damaged corn proved of no service to the plaintiffs, for the brooms that the corn of the new crop would have made of itself would have been worth as much as the brooms made of both; that, after using of the damaged corn as stated, there was left of the same sixteen tons; the company having failed to erect the house as agreed, they were compelled to stop business in the house, and, wishing to clear the house, baled six tons of the damaged corn, and shipped it to St. Louis, which, after paying expenses, proved an entire loss; the remaining ten tons of the same they caused to be sold, after notice at public auction on the premises—and it brought ten dollars. That the complainants in the cross-bill quitted the house to the company the 13th day of August, 1858, they having been unable to do so sooner on account of their stock being in the house, and they having no place to store the same. That the house was not erected with all convenient dispatch, nor was it finished in six weeks, although it was possible for it to have been done, nor was it within that time so finished as to begin to receive their stock in shelter, nor had the company, up to when the plaintiffs left, erected the house as required by the agreement; and that the house, so far as the same was erected and pretended to be finished, was so ill and unworkmanlike, and the material so unsuitable, that the same was thereby rendered wholly unfit for a broom factory or other business, the house having been raised a story at a time by setting one story

on another, without properly tieing the timbers together, and without sufficient braces, guarders or other timbers necessary to keep the building firm or plumb, by reason of which, before and at the time the company stopped work on the same and claimed that it was finished, it was greatly out of plumb, weakened and racked, in so much as not only to render it wholly unsuitable for a broom factory, but to cause it to shake and tremble in all its parts, sway to and fro and endanger the lives of those who might be in it when the wind was high, and, as the plaintiffs believed, would fall down. That, if the company had, within six weeks, or any reasonable time thereafter, so finished the house as to have afforded a shelter for their corn grown in 1856, the plaintiffs would have been able to save the same, and manufacture brooms of the same during the fall and winter, 1856, as they expected to have done; that the brooms, if made, would have been worth $2.25 per dozen, and could have been made at a cost of fifty cents per dozen. That, if the house had been erected as agreed, or within a reasonable time thereafter, as contemplated by the agreement, they would, and reasonably must have, in prosecuting their business therein, realized a profit, by the use of the house, of not less than $2,000 per year during the time they were to have had the same, and that, by reason of the company having failed to finish a room in which they could manufacture brooms in cold weather, they had to abandon their business in the house, by which they lost the profits they would otherwise have made, together with $2,000, expended by them in the business. That, by reason of the premises, they had sustained damage in the sum of $7,000, for which they prayed judgment, etc. To the cross-bill, the defendants filed an answer, in substance denying the averments of the cross-bill, re-alleging that the contract for building the house was complied with by the defendants, and that the manner in which the broom factory was built, was agreed to, assented to and accepted and taken into possession by Haven & White, and that no just damages accrued to them. And the complainants below, on the 5th day of September, 1859, filed

their supplemental bill, substantially as the original bill, with the additional allegation that another year's rent had fallen due; to which supplemental bill the defendants filed their answer, adapting their answer to their original bill, and again denying that any thing was due the complainants therein, and, for further answer, repeated the allegations and statements in their cross-bill, and of their answer to the original bill, and prayed to be dismissed, etc.

Proof was taken upon the various matters set forth in the pleadings, and, the cause coming on for a hearing at the March Term, 1864, the court decreed that the complainants below recover of Haven & White the sum of $750; that each pay their own costs, and that the said complainants below be perpetually enjoined from collecting any further rent for the premises. From that decree Haven & White took this appeal.

The questions arising in the case are: First, whether the contract between the building company and Haven & White amounts to a lease of the premises; second, if it be a lease, whether the lessors have their remedy in chancery to recover the rent, by reason of the contract being between two partnership firms, of both which Haven was a member; third, whether Haven & White were discharged from their liability to pay rent on account of the building not being completed within the time agreed upon; fourth, whether Haven & White sustained any damage in consequence of the building not being completed in proper time, and, if so, whether they can recover such damage in this suit, and what is the proper measure of damages in such a case.

Mr. WM. H. UNDERWOOD and Mr. R. F. WINGATE, for the appellants, contended that the contract was not a lease; that the subject of the agreement not being in existence, there could be no present letting, citing Taylor's Landlord and Tenant, §§ 42, 43.

On the question of the measure of damages counsel contended that the company wholly failed to comply with the terms of the agreement, and by reason thereof Haven & White, by their

cross-bill, have a right to recover such direct and resulting damages as they may have sustained by reason of any failure on the part of the company to comply with the terms of the contract entered into between the parties, provided such damages were the natural and proximate consequence of such failure, and the natural and proximate consequence depends upon what damages were contemplated, or may reasonably be supposed to have entered into the contemplation of the parties at the time of making the contract, citing Sedgwick on Measure of Damages, 3d ed. pp. top, 58, 62, 64, 65, 66, 72, 73, 89, 225, 226, 228, 229, 230, 231, 232, and notes 236; *Goodloe* v. *Rodgers*, 9 La. Ann. 273; *Caloitt* v. *McFadden*, 13 Texas, 324; *Hatchell* v. *Kimbrogh*, 4 Jones (N. C.) L. 1863; *Thomas* v. *Winchester*, 2 Seld. (N. Y.) 397; *Fleet* v. *Hallemkemp*, 13 B. Mon. (Ky.) 219; *Piper* v. *Menifee*, 12 id. 465; *Hope* v. *Alley*, 9 Texas, 394; *Davis* v. *Talcott*, 14 Barb. (N. Y.) 611; *Singer* v. *Farnsworth*, 2 Ind. 597; *Hughes* v. *Cannon*, 1 Sneed, 622; *Waters* v. *Towers*, 8 Exch. 401; *Clifford* v. *Richardson*, 18 Ver. 620. Where a party rented a mill for three years and agreed to put in two run of stones and did not, the measure of damages is the value of the use of the stones not furnished, 11 Ill. 613; and the damages arising from a defective bolt furnished, 26 Ia. In covenant for failure to erect fences by the landlord, the value of the crop, when destroyed, is the measure of damages, 16 Ill. 533–4; Sedgwick on Measure of Damages, 364–5; 13 How. 454; 31 Ill. 474.

In cases like this, special damage and loss of profits are recoverable. 26 Ill. 208; 13 How. 447. Contract must govern as to rent. 17 Ill. 38. See also 27 Ill. 408; 19 How. side page 454.

Mr. J. B. UNDERWOOD, for the appellees.

Mr. CHIEF JUSTICE WALKER delivered the opinion of the Court:

It is insisted that the contract in this case does not amount to a lease of the premises, because the ground on which the

building was erected did not belong to appellees when the agreement was executed, nor was the building then in existence. A fair and reasonable construction of the contract, we think, bound appellants for the yearly payment of the stipulated sum as rents ; but it gave them the election by which it could be changed from a lease to a purchase of the property, within the period limited for the purpose. And it provided that the money previously paid as rent, if they elected to purchase, should become a payment on the price of the land. Appellants desired the use of a house, and were willing to lease such a building, and appellees were willing to erect and lease such a building, for five years, at an annual rent of $600. And the house having been erected, and appellants having entered into the possession under the agreement, they cannot deny its legal effect as a lease.

It is true, it is not a formal lease, nor could appellees, at the time this agreement was made, execute a binding lease of lands they did not own, or of a building not then erected ; but the parties had the power to make an agreement for the erection of a house, and for a lease when erected. If appellants treated the building as completed and entered into possession, they cannot escape paying rent according to the terms of their agreement, unless they had become purchasers, and then it would be paid as purchase-money and not as rent. They, however, failed to purchase, and hence are liable for the rents according to their agreement.

This being a contract entered into between two partnerships, and Haven being a partner in each, no action at law could be maintained by one firm against the other. A person being unable to sue himself in any court, if one of these firms were to sue the other such would be the result. At law all of the parties to an agreement, who fail to perform their joint obligations, must be sued by all the parties to whom they are bound. The obligations on both sides in this agreement were joint, and not several. Hence, any suit which might have been brought at law on it would necessarily have been joint, and Haven would therefore have to sue himself in such an action. In such

cases however, to prevent a failure of justice, equity takes jurisdiction and makes compensation for any injury that may have been sustained.

The next question arising in the case is, whether the evidence sustains the allegations in the bill, to authorize a recovery of rent for the use of the building. It appears that, notwithstanding the house was not completed with all reasonable dispatch, appellants entered into its possession, and occupied it for almost two years. It is true, that appellees do not claim that the building was finished until some time in November, 1859, but appellants having taken possession under the contract they cannot refuse to pay rent. It may be, that, by the failure of appellees to finish the building according to the terms of the agreement, appellants were released therefrom; but, by entering into possession, they waived the right, and must be held to a performance of their part of the agreement.

The remaining question is, whether appellants have sustained damage by a non-performance of the agreement by appellees; and, if so, whether such damages may be recouped to the extent of the rent, and, if they exceed that amount, the excess may be recovered over against appellees. This is claimed by appellants by their cross-bill.

The evidence shows, that the building was not inclosed so as to receive the broom brush in as short a period of time as it might have been done by several weeks. Nor do we see that any thing is shown in the evidence that should excuse appellees for the delay. The want of lumber appears to have been owing to their neglect, as it could have been readily procured at St. Louis, and transported by rail to the place where it was needed. And the evidence also shows that workmen could have been procured at the same place. But neither were obtained, nor do we see that any effort was made for the purpose. When it is remembered that appellants had large interests depending upon the punctual performance of their agreement, it was not " reasonable dispatch " to delay the building to suit their convenience. They were bound to use all reasonable effort that was in their power to have completed the building

within six weeks from the time the contract was made, but they failed to make such effort.

Appellees must have believed when they entered into the agreement that they could perform it. They have failed to show that they were prevented by any unforeseen impediment. All reasonable dispatch must mean that all means at their control would be employed, that every reasonable effort would be made to perform the agreement. The evidence shows that, so far from using all reasonable efforts, their hands were engaged, within the six weeks within which this building was to be completed, in the erection or completion of other buildings.

The building was not inclosed so as to receive with safety broom brush when the time arrived when it should have been inclosed. And for the want of proper room for storage, it became necessary to use the building in its uninclosed condition, and the brush thus placed in the building was thereby seriously injured by the weather to the extent that it became almost worthless. That, by reason of the non-completion of the building, appellants were delayed in cutting and housing their corn in proper season, and a large portion of it suffered injury from the effects of frost, rain and other action of the weather. This damage to the broom-corn seems to have been the immediate result of the failure of appellees to have the house in readiness to receive it, as they had contracted they would. And any damage they may have sustained by failing to plaster the house, or in other respects failing to complete the building according to their agreement, would be proximate damages growing out of a breach of the contract. And, inasmuch as an action at law cannot be maintained for the recovery of those damages, they may be recouped against the rent under the cross-bill, and, if they exceed the amount of the rent that accrued against appellants, they would be entitled to a decree over for the balance.

The decree of the court below is, therefore, reversed, and the cause is remanded, with directions to refer it to a master to state an account between the parties, in which he will charge appellants with the rents which accrued at the contract price

during the time they occupied the building, and will charge appellees with all damages which were the immediate result of a failure to inclose and complete the building according to their agreement. If such damages shall be found to be less than the rent, then the court will deduct the amount from the rent; but if found to be greater, then the rent will be deducted from the damages, and a decree rendered in favor of appellants for the difference. The master, however, in stating the account, will exclude from his estimate all purely speculative damages, such as probable profits, and will confine the allowance of damages to those which result as an immediate consequence of the breach of the contract.

*Decree reversed.*