## CROSS v. RAMDULLAH. *

(Circuit Court of Appeals, Ninth Circuit.    August 1, 1921.)

No. 3596.

1. **Landlord and tenant ⬾33—Oral agreement of lessor, in consideration of lessee's remaining in possession following lessor's breach of contract, held supported by sufficient consideration.**

Where a lessee of rice lands, on failure of the lessor to furnish sufficient water for irrigation purposes as required by the lease, signified his intention of exercising his option to terminate the lease, but was prevailed on not to do so, a subsequent oral agreement of the lessor that, if the lessee would continue in possession of the land and care for the crops planted he would repay all rentals on lands failing to produce normal crops, relinquish all claims for rentals not paid on such lands, and pay the expenses incurred by lessee in planting and caring for the rice on nonproducing lands, was not invalid for want of consideration.

2. **Frauds, statute of ⬾131 (1)—Oral agreement of lessor held not to "alter" or modify written lease, within statutory prohibition.**

Where a lessor of rice lands failed to furnish sufficient water for irrigation as required by the lease, whereupon the lessee signified his intention of exercising his option to terminate the lease, but was prevailed on by the lessor not to do so, a subsequent oral agreement, prior to the expiration of the term, that, if the lessee would continue in possession of the land and care for the crops planted, lessor would repay all rentals on lands failing to produce normal crops, relinquish all claims for rentals not paid on such lands for the year, and pay the expenses of planting and caring for the rice thereon, was not an alteration of the written lease within the purview of Civ. Code Cal. § 1698, providing that a written contract may not be altered, otherwise than by a contract in writing or an executed oral agreement.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Alter—Alteration.]

3. **Appeal and error ⬾1064 (2)—Court's allusion to oral agreement as modification of written lease not prejudicial, where question of existence of agreement left to jury.**

In an action by a lessee of rice lands for damages for the failure of the lessor to furnish sufficient water for irrigation purposes, as required by lease, the court's allusion in his instructions to an oral agreement of the lessor, as a modification of the written lease, was not prejudicial error, where the question as to whether such agreement had in fact been made was left to the jury.

4. **Appeal and error ⬾1050 (1)—Admission of hearsay testimony that purchaser of land told lessee he might continue in possession held not prejudicial.**

In an action by a lessee of rice lands for his wrongful exclusion therefrom, following the execution of a contract for the sale thereof by the lessor to a third party, the admission of hearsay testimony that the latter told plaintiff he was anxious to have him continue on the land, and for him to tell the lessor so, was not reversible error, being harmless, where plaintiff further testified that, following such conversation, he saw lessor, who said he could not continue the old lease, but would give him another on a different rental charge, such purchaser testified as to his version of the conversation, and lessor testified that he sold the land, but claimed that the purchaser had told him to cancel the leases.

5. **Landlord and tenant ⬾95—Lessor not empowered by executory contract of sale to cancel leases.**

A contract by a lessor to sell leased lands, which provided that title thereto was to be clear of incumbrances, except lessees' leases; that,

---

⬾For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Rehearing denied October 10, 1921.

when the balance of the purchase price was paid, lessor would turn over to the purchaser all moneys received by him on account of the leases and assign the latter; that the balance of the purchase price should be paid and title conveyed within 30 days after irrigation bonds were voted and issued, but that, if they were not voted within 6 months, the agreement was to terminate; that the balance due should be paid on or before a date on which the rentals were available, on which date the purchaser should pay to the lessor all amounts due on advances made by him to tenants on the land, and the lessor turn over to the purchaser all mortgages securing the same and the tenant's leases—was · not a contract of sale within the lease reserving to lessor the right to sell the leased lands at any time during the life of the lease; the purpose or intent of the parties not being to make a present sale, nor to disturb the lessees' possession, the title not having passed, and, the purchaser being willing to have lessee remain in possession, the lessor having suffered no inconvenience by not being able to render possession, so that lessor was not empowered by reason of such contract to cancel the leases.

**6. Parties ⬳19—One of several colessees, hiring lessor to harvest crop, may enforce contract without assignment from other colessees.**

A lessee of rice lands, who with his colessees hired the lessor to harvest and take care of the crop, may sue in his name alone for damages for such lessor's negligence in so doing, regardless of any assignment of their causes of action by such colessees; the contract being personal with lessee.

**7. Landlord and tenant ⬳132(3)—Measure of damages for wrongful exclusion from leased rice lands stated.**

In a lessee's action for his wrongful exclusion from leased rice lands, for the irrigation of which the lessor failed to furnish sufficient water, plaintiff could recover the profits which ordinarily, naturally, and in the usual course of proper cultivation the lands would have produced from growing a crop of rice during the time of such exclusion, to determine which the jury should ascertain what would have been the probable production on such lands during such time, assuming they were properly prepared, planted, cared for, and harvested, and the value of the crop in the markets, deducting the cost and expense of cultivation, harvesting, and marketing, and the rent that would have been due under the lease, in view of Civ. Code Cal. § 3300, declaring the measure of damages for a breach of contract to be the amount which will compensate the party aggrieved for all the detriment proximately caused thereby. which in the ordinary course of things would be likely to result therefrom; the rule that the proper measure of damages is the difference between the rent agreed to be paid and the actual rental value being applicable only where there has been a total failure to furnish water, and not where the lessee is excluded from the land.

**8. Contracts ⬳353(5)—Instruction on burden of proof as to understanding of contract, identity of which is in issue, held correct.**

In an action by a lessee of rice lands for breach of the lessor's contract to harvest, thresh, sack, and haul to destination the crop grown, where the testimony was conflicting as to whether a written contract, of which profert was made by defendant, was the one signed and executed by plaintiff, the court did not err in instructing the jury that the paper being produced by defendant, having been drawn in his office and its terms dictated by his attorney, the burden was on him to show that its contents and the meaning of its terms were fully made known to plaintiff, and that it was duly executed by him, but that, if the document was in its present form when signed by the parties, it would be formally sufficient to constitute a contract, and the burden would be on plaintiff to show that his signature was induced by defendant's misrepresentation.

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**9. Contracts ⬤⇒349(7)—Evidence of cost of performing written contract inadmissible.**

In a lessee's action for lessor's breach of a contract to thresh the crop grown on the leased premises, evidence as to the cost of threshing it and of the equipment purchased with which to do so was properly denied as irrelevant; the issue being as to the extent of lessee's liability for the services performed by lessor under the written contract.

**10. Witnesses ⬤⇒275(6)—In action for exclusion from leased premises following sale, cross-examination as to other leases made subsequent to sale admissible.**

In an action for wrongful exclusion of a lessee from the leased premises following sale to a third party, where there was evidence that lessor might have leased portions of the land claimed to have been sold, subsequent to such sale, and taken mortgages back from the lessees, the overruling of an objection to cross-examination of lessor as to what were the terms of such leases, to which he replied, "If there was a lease, it would be in the form of my regular lease," was not erroneous.

**11. Witnesses ⬤⇒275(4)—Defendant testifying to irregular banking transaction might be asked as to his knowledge of similar transaction for a fraudulent purpose by another.**

Where, in an action for wrongful expulsion of a lessee following sale by lessor, there was evidence that lessor had leased a portion of the lands after such sale, and the lessor, in explanation, testified that, though a crop mortgage on the lands sold, which with a note, was given him for his accommodation, and to permit the execution of which he verbally turned over the crop to the mortgagee, recited that he had given the latter a lease on the land, he had never executed such lease, and that he hypothecated the note to a bank, giving it his personal guaranty, he might be asked whether he did not know that that was a method used by an official of another bank of covering withdrawals and having them apparently secured by such methods for the purpose of deceiving the bank examiner.

**12. Landlord and tenant ⬤⇒48(1)—Evidence as to availability of water for irrigation purposes held sufficient for jury, in action for lessor's failure to furnish quantity required by lease.**

In an action by the lessee of rice lands for the lessor's failure to furnish sufficient water for irrigation, though the lease provided that the lessor did not assume any responsibility for furnishing any specified quantity of water, but only that water should be furnished in the quantity available from a certain irrigation canal, *held*, that the court did not err in refusing a nonsuit.

In Error to the District Court of the United States for the Second Division of the Northern District of California.

Action by one Ramdullah against P. B. Cross. Judgment for plaintiff, and defendant brings error. Affirmed.

This is an action on the part of the defendant in error to recover damages in relation to several leases of real property, made by plaintiff in error to defendant in error and another or others, for the seeding, growing, and production of rice. Reference will be made herein to the parties as plaintiff and defendant.

The leases as set forth by the first count are four in number, bearing date, respectively, as therein stated, February 28, March 13, April 2, and February 13, 1918. The term of each lease is two years. The rent reserved is $50 per acre for the term, payable $6 per acre on the execution of the lease, $25 per acre December 1, 1918, and $19 per acre December 1, 1919. The $6 per acre on each lease was paid as stipulated. The lessees, other than Ramdullah, assigned to him prior to the commencement of the action.

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Immediately upon the signing of the leases, and thereafter, lessees entered into possession of the premises and planted the same to rice. A chattel mortgage was given the lessor, empowering him to take possession of the rice as soon as threshed, and to store and sell the same, and out of the proceeds to pay himself the balance of the rental due and account to lessees for the surplus. It is alleged that about June 1, 1918, defendant agreed with the lessees that he would charge and collect rent only for those acres described in the leases which produced a fair and normal crop of rice; that such a crop was produced upon 300 acres only of the land, and that was all that was harvested; that, when the rice was matured, plaintiff employed defendant to harvest it, under certain terms for performing the service; that on deduction of the rent due, and the expenses of harvesting the crop, there was left due plaintiff from defendant a large sum of money, to wit, $59,025, for which recovery is sought.

The second count is predicated upon alleged negligence on the part of defendant in harvesting and caring for the crop.

The third is predicated upon the alleged failure of defendant to furnish water for the irrigation of the lands covered by the leases, in compliance with the stipulated requirements, and it is alleged that upon defendant's failure so to do by the 25th of April, 1918, or to deliver or furnish any water until June 1, 1918, the lessees notified defendant of their desire and intention to terminate the leases, and that thereupon defendant agreed and promised that, if lessees would continue in possession of the land and care for the crops of rice planted, if said lands did not produce a normal crop of good rice, defendant would repay lessees all rental moneys on the lands so failing to produce, and would relinquish all claims for rentals for the year 1918 on such lands as failed to produce a normal crop, and would also pay to lessees all moneys which had been expended or might thereafter be expended by lessees on the nonproducing lands. It is then further alleged that 425 acres of the lands failed to produce any crop of rice whatever, and judgment is claimed for the rental advanced thereon and for the money expended in planting and caring for the crop, which failed by reason of the failure of plaintiff to deliver the water on the lands as required under the leases.

The fourth count pertains to the alleged wrongful exclusion of the lessees from the lands leased for the year 1919.

The fifth has relation to plaintiff's employment of defendant to harvest the crop grown under a subsequent lease, of date July 9, 1918, and defendant's alleged failure to account for the proceeds obtained for the crop.

The sixth is predicated upon defendant's alleged negligence in harvesting and taking care of the rice grown on the premises under the leases, whereby much of it was allowed to deteriorate, to the plaintiff's damage.

The seventh count is for damages arising upon the alleged failure of defendant to furnish the amount of water stipulated to be furnished under the lease of July 9, 1918.

Bacigalupi & Elkus, of San Francisco, Cal., Frank Freeman, of Willows, Cal., and John S. Partridge, of San Francisco, Cal., for plaintiff in error.

Claude F. Purkitt, of Willows, Cal., and John W. Preston and Robert Duncan, both of San Francisco, Cal., for defendant in error.

Before GILBERT and HUNT, Circuit Judges, and WOLVERTON, District Judge.

WOLVERTON, District Judge (after stating the facts as above). The first assignment of error relied upon by defendant is predicated upon the court's admission, over objection, of testimony adduced by plaintiff for establishing an alleged oral agreement between the parties in modification of the original contracts of leasing, and the instructions of the court submitting to the jury the question whether such an agree-

ment had in fact been entered into. By reference to the leases, which are made a part of the first count, it will be found that the lessor agrees that the water shall be made available by the 25th of April of each year, and that, in the event it is impracticable to supply water by that date, the lessees shall have the option of terminating the leases, by serving notice upon the lessor of their election so to do, in which case the lessor agrees to pay to the lessees the cost of work already done by them and 10 per cent. of such cost in addition, which shall be received by the lessees in full satisfaction of all damages and demands. It is further provided that—

"If the said lessees do not exercise said option and give the notice herein provided for, then they shall be deemed to have waived their right to terminate said lease, and shall be deemed to have waived any and all claims against the lessor on account of his failure to supply water."

It will be noted that no specific time is fixed within which the lessees are to declare their election to terminate the leases. There is evidence, however, tending to show that lessees were prevailed upon not to terminate their leases, as others had done, by the promise that water would eventually be furnished for successful irrigation of the rice crops, and the situation seems to have remained in statu quo until about June 1, 1918, when the lessees signified their intention of abandoning the premises, whereupon the defendant, it is alleged, promised and agreed that, if lessees would continue in possession of the land and care for the crops theretofore planted, the defendant would repay all rentals on lands failing to produce normal crops, and relinquish all claims for rentals not paid on such lands for the year 1918, and would pay to lessees the expenses incurred by them in planting and caring for the rice on nonproducing lands. In this proposition lessees concurred. The agreement was oral, and it is claimed that it is invalid for two reasons, namely, that there was no consideration to support it, and that it is within the statute of frauds, "being a lease for more than one year."

[1] As proved to be the case, the defendant was able to furnish water for the proper irrigation of only about 300 of the 725 acres covered by the leases. Some such result was probably in the minds of the parties June 1st. The situation was that defendant was at the time in default, to the manifest injury and damage of the lessees, for which he had incurred a heavy liability to them. Obviously, it would inure to his benefit to have the lessees remain on the land and care for the crop. The waiver, therefore, on the part of the lessees, of the right of exercising their option to terminate the leases, constituted a sufficient consideration moving to the defendant, the lessor. On the other hand, the promise of the augmented payment to the lessees for the injuries they would sustain, above that provided for by the leases in case they exercised their option, was sufficient consideration moving to the lessees to support the promise. In the adjustment, defendant would receive his full rental for the acres for which he would be enabled to supply an adequate amount of water, which proved to be 300; otherwise, he would lose all, and be rendered liable for the payment of the stipulated damages, namely, the cost of work already done by lessees and 10 per cent.

added. So it is plain that the alleged promise or agreement was attended with sufficient consideration to uphold it, or render it valid and binding upon the parties.

[2] The second objection is predicated upon the postulate that the alleged new promise or agreement is an alteration of the written leases, within the purview of section 1698 of the Civil Code of California, which provides that—

"A contract in writing may be altered by a contract in writing, or by an executed oral agreement, and not otherwise."

That the oral agreement was not executed must be conceded, for the action is to compel observance of the agreement on the part of the lessor. The purpose of the statute was doubtless to prevent the alteration or modification of contracts which the law requires to be in writing, and which are invalid unless so evidenced, by oral agreement between the parties, unless such agreement were subsequently wholly executed, which means executed on the part of both parties thereto. Pearsall v. Henry, 153 Cal. 314, 95 Pac. 154, 159.

Regarded as an alteration or modification of the leases, the alleged oral promise or agreement must fail. But should it be so regarded? It was entered into to meet a situation that had arisen and for a compromise and adjustment thereof to suit the purposes of the parties. The leasing was for a term of two years, the major part of which in time was yet to run. The effect of the agreement, if made, which was for the jury to determine, was not to alter the terms of the leases in any respect, nor to modify the stipulations therein contained, but to take care of the situation that had then arisen, and enable the parties to harvest the crop which would eventually be produced for the year 1918; and it was to be performed within a year. The agreement did not contemplate a change that was to be imposed upon the contracts of leasing for future observance. Its single purpose was to meet an emergency, leaving the leases, when that was disposed of, to run on as they were written. We are impelled to the conclusion that the alleged promise or agreement must be regarded as a new and independent agreement, and not as an alteration or modification of the leases, within the meaning of section 1698 of the Civil Code. Such a conclusion was reached in Stockton Combined H. & Agr. Works v. Glens Falls Ins. Co., 121 Cal. 167, 53 Pac. 565, where the oral agreement was to settle a loss under an insurance policy, although founded upon the policy. See, also, Pearsall v. Henry, supra, to a like purpose.

[3] In his instructions the learned judge of the trial court alluded to the agreement as a modification, but that could by no means have affected the defendant injuriously, as the question as to whether the agreement had in fact been entered into was left to the jury to determine.

[4] It is next urged that the court erred in admitting evidence of conversations between Ramdullah and one Obear, and in its instructions to the jury with regard to the cancellation of the leases. We are dealing now with the first four leases. There is a stipulation in the leases as follows:

"It is further mutually understood and agreed that the lessor hereby reserves the right to sell any portion or all of said lands at any time during the life hereof, or any continuation hereof, it being agreed, however, that possession of the land sold shall not be given to the purchaser until the lessees have had time to harvest and remove the season's crop growing thereon at the time of said sale, and thereupon said lease shall be terminated at the option of the lessor. Should a sale be made before rice has been planted thereon, and after the land has been prepared or partially prepared for planting, the lessor agrees, that he will pay to the lessees the cost of such work in preparing said land as may then have been done."

It will be noted that the two leases first made bear date, respectively, February 13 and February 28, 1918. The second two bear date March 13 and April 2, 1918. On March 4, 1918, the defendant entered into a contract with W. H. Obear, whereby Obear agreed to buy and defendant to sell certain described real property, containing 1,055.08 acres. The contract covers only 375 of the 725 acres of the lands described in the leases. To be more exact, it covers all the lands described by the last three leases, but not more than 50 acres comprised by the first. On March 8, 1919, defendant notified lessees as follows:

"Gentlemen: Your leases Nos. 32, 33, 34, and 42 are hereby canceled for 1919. The lands embraced in these leases have been sold to Mr. W. H. Obear."

Plaintiff, while a witness in his own behalf, was asked what Obear said to him about the sale at a time in San Francisco, and was permitted to answer, over objection that it called for hearsay testimony, which is assigned as error. Witness related in effect that Obear told him that he had bought the land, but that so far as he was concerned he was anxious to have witness continue on the land, and for him to go back and tell Cross about it, that he (Obear) had no objections. Witness further related that he immediately saw Cross, who said he could not continue the old lease, but would give him another upon a different rental charge. Obear was later called as a witness for plaintiff, and gave his version of the conversation. Cross was subsequently called, and insisted that he had sold the land to Obear, but claimed that Obear had told him to cancel the leases. If it be considered that there was technical error in admitting the testimony, because hearsay, it is obvious that it was entirely harmless, and therefore not reversible error.

[5] The more serious question relates to the instruction of the court touching the effect of the alleged sale to Obear as to authorizing or entitling the defendant to terminate the leases. The court instructed as follows:

"As to the third defense, that the cancellation was had because a part of the land had been sold, it is sufficient for me to advise you that the transaction between defendant and Obear, looking to a sale of a portion of these lands, as disclosed in the evidence, was not such as under the terms of the leases authorized their cancellation by defendant."

By the terms of the contract, the title to the property was to be good and merchantable, free and clear of incumbrances, excepting, among others, "leases for a term of two years, under the terms of which the tenants agree to pay as rent therefor, the sum of $25 per acre, or more."

The consideration to be paid was $5,000 in cash, and the balance of $53,029.40 as stipulated.

Among other provisions of the contract, it was agreed that when the balance of the purchase price was fully paid, defendant would turn over to Obear all moneys received by him on account of the leases, less $1 per acre, and would also assign the leases to Obear. The balance of the purchase price was to be paid and the title conveyed within 30 days after certain irrigation bonds were voted and issued by the irrigation district; but it was further understood that, if the irrigation bonds were not voted within 6 months, the agreement was to terminate, and defendant was to return to Obear the $5,000 paid on the purchase price.

The subsequent or supplemental agreement, of date May 31, 1918, is in modification of the first, but it contains nothing that might affect the present controversy, unless it be a provision making the balance due payable on or before March 1, 1919—that is, as soon as the rentals for the land were available, but not later than that date; and it was further provided that on or prior to that date Obear should pay to defendant all amounts due on advances made by the latter to tenants on the land in connection with their tenancy and the handling of their crops, and that defendant should turn over to Obear all mortgages securing the same and the leases of the tenants.

From a careful scrutiny of these agreements, it is obvious that it was not the purpose or intent of the parties to make a present sale of the lands, and, further, that it was neither their design nor purpose at any time to disturb the possession of the lessees, even in the event of a completed sale in pursuance of the agreements. Furthermore, it was problematical whether the agreements would ever terminate in a consummated sale by transfer of the title, but in any event the lessees were not to be disturbed, for they were expressly excepted from the assurance against incumbrances.

From Obear's testimony, it would seem that he so understood the transaction. When approached by Ramdullah touching whether Ramdullah would be permitted to stay on the land another year, he replied, "Yes; you have a lease, haven't you, for two years? I don't know of any objection why you cannot stay there;" and further that he had no objection to Ramdullah's staying there. He also testified that he was surprised when apprised of the fact that defendant had canceled the leases. The defendant testifies that Obear told him to cancel the leases "at the time it became a binding agreement to buy and sell; that was September, 1918."

The allusion is presumably to the time when it is claimed the irrigation district bonds were voted. They were, in fact, according to defendant's testimony, issued and sold on September 13th, but we are not impressed that the incident has any peculiar or material bearing upon the immediate controversy. The contract was not a present sale. It was not so intended by the parties, and they did not so treat it. Thenceforward, from the date of the contract, Obear was the only person authorized to cancel the leases, if any one, and he was not disposed to do it, and made no attempt in that direction. Defendant, however, for

some purpose of his own, did attempt to cancel them, and says that he did so at the request of Obear, recognizing his want of authority otherwise. He had agreed to sell subject to the leases, and reserved to himself no authority respecting them, and it is doubtful whether he could cancel the leases at all without authority from Obear in writing; the transaction being one concerning real property.

But, beyond all this, it is clear that the agreement, considering the intention of the parties and its purposes, is not one of sale within the meaning of the above-quoted clause in the leases, and defendant was not empowered by reason thereof to cancel the leases.

"Not until the sale had been consummated," says the court, in Lewis v. Agoure, 8 Cal. App. 146, 148, 96 Pac. 327, 328, "could the lessee be compelled to relinquish possession upon notice and payment of the amount provided to be paid. Unless a sale had actually been made, which necessarily included a conveyance of the ranch, the lessee might well deny the right of the lessors to cancel his lease, and compel him to deliver up the possession of the premises."

As we have above indicated, the true intendment of the contract is that the lessees should not be disturbed; but, however that may be, the title did not pass out of the defendant to Obear, and defendant suffered no inconvenience by not being able to render possession on account of the leases. The trial court was right in its instruction.

[6] Another assignment of error is predicated upon the alleged insufficiency of the assignment by his colessees of their cause of action, to authorize Ramdullah to prosecute the action in his name alone. The objection is directed to the second count, which charges negligence on the part of the defendant in harvesting and taking care of the rice crop. It appears by the complaint that the plaintiff—that is, Ramdullah—hired the defendant to do the harvesting, and the second count relates to a breach of that contract. The contract being personal with Ramdullah, he certainly has a right to enforce it, regardless of any assignment to him from another or others.

[7] The next question presented is whether the court adopted the measure of damages applicable. This relates to count 4 of the complaint, whereby damages are sought by reason of the excluding of the lessees from the premises by the lessor for the year 1919, which is the second year covered by the four leases. The court instructed as follows:

"The rule of damages for such wrong is that plaintiff would be entitled to recover the profits which ordinarily, naturally, and in the usual course of proper cultivation these lands would have produced from growing a crop of rice thereon in the year 1919. That you will determine by ascertaining, from all the evidence in the case bearing upon the subject, what the probable production in rice would have been on these lands during the year, assuming that the land had been properly prepared, planted, cared for, and harvested, and the value of such crop in the markets for that year, deducting therefrom the cost and expense of cultivation, harvesting, and marketing, and the rent that would have been due under the terms of the leases."

The contention of counsel for defendant is that the proper measure of damages was the difference between the rent which Ramdullah and his associates had agreed to pay and the actual rental value of the

lands for the year 1919, and it is urged that the measure adopted by the court is too speculative and uncertain by which to ascertain the damages sustained by the lessees, if any. The Supreme Court of California has spoken on the subject, and has declared that in a case of leasing, where the lessor has refused to let the tenant into possession as covenanted under the lease, the measure of damages is in substantial accord with the instruction given in the instant case. Rice v. Whitmore, 74 Cal. 619, 16 Pac. 501, 5 Am. St. Rep. 479.

The doctrine of this case has been recently reaffirmed by the California District Court of Appeal, Third District, in Parkinson v. Langdon, 36 Cal. App. 80, 171 Pac. 710. There the lessee agreed to crop the land to beans, which he failed to do after being let into possession, and the action was one sounding in damages for breach of the obligation to plant and care for the crop. The court discusses the statute (section 3300 of the Civil Code), which declares that the measure of damages for a breach of an obligation arising from contract "is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which in the ordinary course of things would be likely to result therefrom," and is of the opinion that the proper measure of damages applicable was the "profits which would ordinarily and naturally, and in the usual course of things, have been derived from performance." The like rule was applied in an earlier case, where the action was to recover for damages sustained for breach of contract to furnish water for irrigation. Allen v. Los Molinos Land Co., 25 Cal. App. 206, 143 Pac. 253.

The rule that counsel contend for is held to be applicable where there has been a breach of contract to furnish water for irrigation purposes, and there has been a total failure to deliver. Briles v. Paulson, 170 Cal. 408, 149 Pac. 804. See Crow v. San Joaquin & K. R. Canal & Irrigation Co., 130 Cal. 309, 62 Pac. 562, 1058, and Pallett v. Murphy, 131 Cal. 192, 63 Pac. 366. These cases, however, are to be distinguished from those previously cited. Where there has been a total failure to deliver water, the lessee would perhaps be adequately compensated by the difference between the rental value of the land with water and such value without. But where the lessee is excluded from the land, and is allowed to have no use of it at all, and that is the ground of complaint, it seems ill suited to the usual, natural, and legitimate consequences to say that the only compensation to which he is entitled for a breach of the covenant for possession during the term is the difference between the stipulated rental and the rental value of the land. It might happen, and often would, no doubt, that there was no difference in that respect; but the rule would afford an inducement for the landlord, who fancied that he had made a bad bargain, to breach it or force the tenant to pay the better rental. Such, we are impressed, is not the law applicable here, where the leasing is for the growing of a specific product. It must be supposed that in such a case the parties had in mind the loss of profits that would ensue by a failure in production. Such a loss is the proximate, natural, and consequential result of a breach which entails nonproduction. That the loss might in some in-

stances be difficult of ascertainment does not vitiate the rule which makes it the measure of damages. Shoemaker v. Acker, 116 Cal. 239, 48 Pac. 62, 64.

[8] Another alleged error: The lessees employed the defendant to harvest, thresh, sack, and haul to destination the rice crop grown under the leases for the year 1918, the contract for which all parties agree was in writing. The defendant produced what he claimed to be the contract, and a controversy arose touching whether the paper so produced was the one signed and executed by the lessees; the lessees claiming that the one signed by them consisted of a single sheet, whereas the one of which profert was made contained several sheets bound together with a cover. About this there was a direct and insistent conflict in the testimony, and the court submitted the question involved for the determination of the jury. It is not disputed that the controversy was one for the jury, but it is insisted that the court erred in instructing that the burden was upon the defendant to show that the Hindus knew what they were signing. What the court instructed was:

"The paper being produced by the defendant and having been drawn in his office and its terms dictated by his attorney, the burden is cast upon him to show that its contents and the meaning of its terms were fully made known to plaintiff and his associates before they signed it, and that it was duly executed by them; otherwise, it has not been established. * * * If, however, the document was in its present form when signed by the parties, it would be formally sufficient to constitute a contract, and the burden would then be on the plaintiff to show that the signatures of himself and his associates were, as claimed by him, induced by misrepresentation of the defendant or his agents."

We think, when the entire instruction is construed as a whole, it is not subject to the criticism directed against it. We find no exception to that part of the instruction wherein it is claimed that the court told the jury that they should consider the character and contents of the papers themselves, in determining the issue presented to them.

[9] It was sought to show the cost to defendant of threshing the crop and the cost of the equipment purchased with which to do the work, which the court denied as irrelevant. In this there was no error. It is admitted by all that there was a written contract for doing the work, and the issue presented was respecting the extent of plaintiff's liability for the services performed by defendant under the contract.

[10] Further error is predicated upon the court's ruling in permitting plaintiff to propound to defendant, while a witness in his own behalf, certain questions on cross-examination, to understand the relevancy of which requires some exposition of the record. It was developed in the course of the cross-examination that defendant might have made a lease or leases, on portions of the land that he claimed to have sold to Obear, subsequent to the sale, and taken mortgages back from the lessees, and he was asked for the terms of the leases, if he remembered, to which he replied:

"If there was a lease, it would be in the form of my regular lease."

There was an objection to the question, which was overruled, and error is assigned. The mere statement of the proposition is enough to demonstrate want of merit in the assignment.

[11] On further cross-examination, defendant testified that one Hechtman had given him a crop mortgage on the Obear land for his accommodation; that he had turned the crop over to Hechtman to enable him to execute the mortgage; that the turning over of the crop was merely verbal; that the mortgage recites that he had given Hechtman a lease on the land, but that he (defendant) had never executed any lease to him; that Hechtman gave him, with the chattel mortgage, a note for $45,000, and that the whole was for defendant's accommodation; that defendant hypothecated the note to the Capitol National Bank and received the money, but gave the bank his personal guaranty of payment. Thereupon he was asked:

"Don't you know that that was one of the methods used by Frank Brush, in the Santa Rosa National Bank, of covering up his withdrawals of money from the bank, and having them apparently secured by just such methods as this, and that that was done for the purpose of deceiving the national bank examiner?"

The witness answered, "No;" but there was an exception noted to the question.

As the trial court remarked, the latitude in cross-examination is very wide; but, further than this, the court exercises a legal discretion in such matters, and we do not think that there was any abuse of its discretion in allowing the question to be answered. It is urged that the question was propounded to create a prejudice against the defendant; but it must be conceded that the transaction narrated was somewhat irregular, to say the least, and the inference which the question suggests was rather a natural one. The instant controversy is not affected by the court's ruling touching the effect of the Obear agreement.

[12] Another error is predicated upon the court's refusal to grant a nonsuit as to the seventh count of the complaint, on the ground that there was not sufficient evidence to support it for the jury. The count relates to the lease of July 9, 1919, which contained a stipulation as follows:

"Lessor does not assume any responsibility for furnishing any specified quantity of water, but only agrees that water shall be furnished in accordance with the quantity that is available from the main canal of said Provident Irrigation Syndicate or Cross project."

Ramdullah testified that he did not get enough water, and in consequence the rice did not mature, except on about 350 acres, which produced a crop fit for harvesting; the failure to produce a crop on the balance of the 1000 acres was due to the fact that the water was irregular and insufficient, and that the man in charge of the ditches said he wanted the water to take down to the land of Kim & Porter.

McDaniel, the person in charge of the ditches, relates that Kim & Porter, who owned the land to the south, told him that they would have to have water, and Hudson, who had charge for Cross (the defendant), directed him to give Kim & Porter eight second feet. This resulted

in a shortage for Ramdullah. So it appears that water was available, but that defendant chose to place it elsewhere.

The evidence was sufficient for the jury, and the nonsuit was properly denied. The seventh, eighth, and tenth assignments, relied upon by counsel for defendant in their briefs, have been examined, and we find no error pertaining thereto. The subject of the eleventh assignment has been previously taken care of in this opinion.

Affirmed.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes