## J. H. SUPPLEE v. JOHN TIMOTHY.

124   375
21 SC ¹267

ERROR TO THE COURT OF COMMON PLEAS OF DELAWARE COUNTY.

Argued February 12, 1889—Decided February 25, 1889.

1. Where a tenant has received from his landlord the three months notice to quit required by an existing lease, and on application to the landlord he is told, "If you want to stay, you can stay," the notice is in effect withdrawn, and the covenants of the existing lease are a sufficient consideration for a contract of renewal.

Statement of Facts.

2. The weight of oral testimony is largely affected by matters peculiarly before the trial judge; an important element, too, is the weight to be attached to writings, with the circumstances under which they were written; wherefore, it is not error to charge, with other proper and appropriate instructions, that " the testimony is about equally balanced."

3. If on the trial, an offer of improper testimony upon the measure of damages is admitted, but afterwards the jury are charged that the testimony received was erroneous, and correct instructions as to the true measure of damages are given, the error in the admission of the offer is thereby cured.

Before PAXSON, C. J., STERRETT, WILLIAMS, McCOLLUM and MITCHELL, JJ.

No. 189 January Term, 1888, Sup. Ct.; court below, No. 86 June Term 1886, C. P.

On April 2, 1886, J. Howard Supplee, attorney in fact of J. F. Tobias, by duly executed letters, began proceedings before a justice of the peace, under the landlord and tenant act of December 14, 1863, P. L. (1864) 1125, to dispossess John Timothy of the demised premises, resulting in a judgment on April 12th, in favor of the plaintiff for the possession of the premises and costs. The writ awarded having been executed, the defendant filed an appeal to the Court of Common Pleas, which was put at issue under a plea that " on March 23, 1886, the premises were demised and let unto the defendant for a further period from April 1, 1886, under the same rent," etc.

At the trial on September 26, 1887, it was shown that on March 31, 1884, the plaintiff, as attorney in fact of Joseph F. Tobias, the owner, by written articles had demised a tract of farm land in Radnor township to the defendant for the term of one year from April 1, 1884, at the rental of $365, in quarterly payments. The article contained a provision that either party might terminate the lease at the end of said term, by giving the other notice thereof at least thirty days prior thereto. The defendant went into possession under the lease and held over during the second year.

On December 31, 1885, the plaintiff served a notice on the defendant to quit the premises at the end of the then current year. On March 4, 1886, the plaintiff leased the farm to Michael Gaffeny, and on April 2d, the defendant continuing in possession, the proceedings were begun which terminated

as stated. On April 13th, the constable, who had the writ of dispossession for execution, found the defendant removing his stock, implements and property and gave him further time. The removal was completed between April 13th and 16th, when Gaffeny took possession.

The defendant testified that after the notice to quit had been served on him he saw the plaintiff who then wanted $400 rental; that a week or so afterwards he went to Mr. Tobias, the owner, in Philadelphia. The defendant proceeded:

" And I told Mr. Tobias all about it, and Tobias said, No, if you want to stay, John, you can stay on there ; you know, he said, John, that I do not care a great deal for a few dollars; and with that I made my mind easy.

" Q. You didn't get ready to go out?

" A. No, sir ; a week or so afterward, I met Mr. Supplee, and I asked Mr. Supplee if I could stay, and he asked me what I was going to do, and I told him that I would stay on; I told him that I had seen Mr. Tobias, and that he had told me I could stay on there."

Subsequently the defendant, as he testified, told Mr. Supplee that rather than go out he would pay the increased rental. The defendant testified further that he had twelve cows, two horses and farming implements which he had been obliged to dispose of by sale within a week or so after he was ejected, because he could get no other place ; he sold his cows at $12 apiece, that he had given $55 and $75 for; that his loss was " a good bit. It was $1,000."

William Grogan, called for defendant, was asked to testify to the loss sustained by the defendant upon the sale of his stock at private sale.

Objected to.

By the court: He would not be permitted to sell them except at a fair sale, and then I am inclined to think it is his duty to give fair notice to the plaintiff that he would hold him for the difference. We will hear the evidence, and note an exception.[1]

Under this offer the witness testified that he had been called on with Benjamin Kirk, who had since died, to put a valuation on the stock sold; they valued the loss on the cows at about $200, adding $17 a head to what he had sold them at;

the loss on the horses at $50; the loss on his farming imple-
ments at $300; on his furniture at $100. The defendant had
told the appraisers the prices at which he had sold, and they
knew the value of the articles.

On part of the plaintiff, J. F. Tobias, the owner of the
land, testified that the defendant had been to see him after the
notice to quit was served, desiring to re-lease the farm, but
the witness refused to interfere with his attorney in fact, to
whom he referred the defendant; he did not say to the de-
fendant he could stay on, and on February 20, 1886, he had
sent to the defendant a letter, which defendant had admitted
on the witness stand he had received, and of which the follow-
ing was a copy:

"Dear sir: I have just seen Mr. Supplee, the agent of my
property now occupied by you, and, as he tells me there is
some misunderstanding about the renewal of the lease, I would
like you to see him on Monday and arrange the matter. Any
arrangement you make with J. Howard Supplee will be satis-
factory to me.          [Signed]      JOSEPH F. TOBIAS."

At the close of the testimony, the court, CLAYTON, P. J.,
after referring briefly to the preliminary facts, charged the
jury:

The defence is that within a week after the receipt of the
notice, after having tried to make terms with the agent, he
called upon the proprietor, Mr. Tobias, and that Mr. Tobias
told him, that as he had been a good tenant and had been on
the property a long time, he did not care for the loss of a few
dollars, and that he could stay on at the old rent, or words to
that effect. The proceedings, however, went on; they were
not interrupted; and, at the expiration of the notice, Mr.
Tobias, or his agent, issued his process, and the defendant was
ejected. Now, on the 20th of February, (notice, you will
remember, was given on the 31st of December,) Mr. Tobias
wrote a letter to the defendant informing him that there was
some misunderstanding, and that he should see Mr. Supplee.
This was on the 20th of February. Now the main question
in the case is, whether there was a binding agreement between
Mr. Tobias, the proprietor, and Timothy, to continue the lease
on its old terms for another year. In other words, did Mr.

Tobias agree to forbear to proceed under his notice? A voluntary engagement, without a consideration, is not binding in law. Every agreement requires some consideration. This point, however, I have reserved for future consideration.

So far as the present case is concerned, therefore, I instruct you that if Mr. Tobias, after the notice to quit had been served, entered into a new contract with the defendant, and agreed that the tenant should stay for another year at the old rent, then he could not lawfully dispossess the defendant, and the defendant may recover in this action. Now, you will observe that the defendant by his plea admits the lease, admits the notice, admits the regular proceedings, and sets up as a defence a new agreement. The law requires him to prove that agreement. It does not require the landlord to disprove it. The defendant must prove it. He has alleged what he has set up as a defence, and admitted the landlord's case. It is, therefore, his duty to prove to your satisfaction that this agreement was made. The burden is upon him, for by his plea, as before stated, he admits the lease and the notice to quit, and he virtually admits that all the proceedings were regular, and relies wholly upon the alleged new agreement.

[The proof of that agreement must be satisfactory to the jury. The testimony is about equally balanced.] [2] The defendant alleges that the landlord did agree that he should stay on at the same rent; the landlord most emphatically denies that any such agreement was ever made. Both are about equally interested. It will be for you to say whether one is entitled to more credit than the other. As a rule, where witnesses disagree, where their testimony conflicts, it is the duty of the jury to look at all the surrounding circumstances, to look at the subsequent conduct of the parties, and to ascertain, if they can, which tells the truth. And that will be your duty in this case. In the first place, you will say, the parties being in direct conflict, was their subsequent conduct consistent with such an agreement? You will at once see that Mr. Tobias' conduct is not consistent with such an agreement, for he went on and dispossessed the man, and on the 20th of February sent him a notice that there was some misunderstanding, and that he must see his agent, Mr. Supplee. You will say whether it is consistent for a proprietor, after he has,

by a solemn deed, created an agency, and put the whole account in the hands of an agent, whether it is consistent for him, without a revocation of that agency, to interfere with his agent's conduct. You will also look at the subsequent conduct of Timothy. He says that, within a week after the notice was served upon him, that Mr. Tobias made such an agreement with him, and that he relied upon it; yet he tells you he afterward agreed with Mr. Tobias' agent to pay a rent of $400 a year, and the only reason that it was not carried out was that the agent said, you must go and give Mr. Gaffeny $5 to give up his right, and that he said that he would not do that, and the agreement, therefore, went off.

Now, is it consistent with a positive, well settled agreement with Mr. Tobias, upon which the defendant was relying, that he should afterward agree with the agent to pay an advanced rent? You will look at all these surrounding circumstances, for you are to say which of these two witnesses tell the truth. They cannot both be telling the truth; they may both tell the truth so far as they remember it. Mr. Timothy may have had a conversation with Mr. Tobias, and he may have taken something that Mr. Tobias said as an indication that he could stay, and his anxiety to stay may have induced him to believe that there was a positive agreement that he should. It may be that Mr. Tobias sympathized with the man; it may be that he received him kindly, it may be that he said to him, "Mr. Timothy, you have been on that place for 11 years; I have no desire to remove you or put you out; go and see Mr. Supplee, or I will see Mr. Supplee for you and see what can be done." Now, something of this kind may have been said; but the question for you is, was there a positive agreement? not was there a conversation upon that subject? It will be for you to say, gentlemen, whether the minds of the parties came together.

As I before stated to you, where one party is interested, or where, as in this case, both are interested, all other circumstances being equal, one is not entitled to more credit than the other; but, if you find that there was such an agreement; if you find that the minds of the parties came together, then I instruct you that you may find for the defendant. But, if you are in doubt upon that point, if you cannot say from the evidence that there was such an agreement, then the verdict

should be for the plaintiff, for it is the duty of the defendant to prove that such an agreement was made. And if he fails to prove it to your satisfaction, then the plaintiff is entitled to your verdict. In this view you will consider the letter of Mr. Tobias, which was sent on the 20th of February. It is quite clear, that according to his understanding, no such an agreement had been made at that time, at least, for the letter expresses what he believed. A mere conversation, gentlemen, is not an agreement. An agreement in law, is a contract between two or more parties to do or not to do some particular thing for a sufficient consideration. All the terms of the agreement must be understood between the parties; their minds must come together. There must be nothing left for inference, and there must be nothing left for future adjustment. The agreement must be complete in all its essential parts, and the parties must understand it. Then it is binding. Negotiations for an agreement are not binding. Offerings upon one side, propositions or suggestions, in endeavors to come to an understanding not fully acquiesced in, are not contracts in law. When a contract is made, the law requires the parties to stand by it. But it must be a perfect contract; they must understand what they are agreeing to; the minds of the parties must come together; there must be a consideration for it, and then, when the contract is made in that way, the law will not permit the parties to avoid it. It will be for you to say whether, under all the evidence, that kind of a contract was made in this case, for no other kind of an agreement will be of avail for the defendant. You will see here the written lease. All its terms are reduced to writing; it was signed, sealed, and delivered by the parties; it was made with the agent, Mr. Supplee. Under that lease a regular written notice was given, and the proceedings were regular, so far as they appear. They are admitted to be regular. Then you have nothing to try as to that lease and these proceedings. There must have been a perfect understanding between these parties, for you to avoid them, that all those proceedings which had gone before were to be abrogated, and that, from that time, the lease was to be renewed for another year.

If there was such an agreement, then the defendant is entitled to a verdict. If you find that there was not—if such

Charge of Court below.

an agreement has not been proved to your satisfaction—then the verdict should be for the plaintiff. If you should find for the plaintiff, you will simply so state it. That is to say, if you find that there was no such an agreement, or that it has not been satisfactorily proved to you, then you will simply say by your verdict that you find for the plaintiff. There will be no assessment of damages in that case. If, upon the other hand, you come to the conclusion that there was such an agreement as I have stated to you to be requisite, then your verdict will be for the defendant, and you will find the damages that he has suffered because of the unlawful ejectment; because, if there was such an agreement, the ejectment was unlawful.

Now, in ascertaining the damages, you must depend upon the testimony and not decide the case from mere supposition. I charge you that the defendant could not, after he removed from the premises, sacrifice his goods and charge the plaintiff with the difference. He could not do that. It was his duty to do the best he could with his property, and if he wanted to hold the plaintiff for the difference between the then value and the proceeds of the sale of the goods, he should have given him notice that he intended to sell them and that he had no place to store them, and that he would hold him for the difference. He could not have the property assessed or valued by appraisers for himself without notice to the other party, and then at a private sale sell them and hold the landlord for the difference. The law will not permit that method of settling the damages. It was his duty to have done the best he could with his property and whatever damages he suffered, the costs of storing, removing and caring for them, would be a part of his damages. [If they were sold then, they should be sold at the very best price that could be obtained, and he should so prove to you, and the difference between the real value and what they were sold for would be the proper measure of the damages. This does not appear to have been done. He called in a couple of friends, and they put a valuation, not upon the property, but upon the damages, and a part of the damages they assess was the deprivation of the use of the property, which, one of the witnesses says, was $100. That mode of ascertaining the damages is very unsatisfactory and improper. You must have evidence of the loss he suffered

Arguments.

from the deprivation of the use of his property, and you should find that from the evidence. You will have to assess them as best you can if you find that there was an agreement.] [3] That is about all the information I can give you.

Let me repeat the point in the case. It is this: Was there a perfectly settled and understood agreement between Mr. Tobias and Mr. Timothy that he would not proceed to eject him under the notice, and did he agree that he should stay there for another year at the same rent? If you find from the evidence that there was such an agreement understood between the parties in all its essential terms, then you may find for the defendant, and proceed to assess the damages he suffered from this unjust ejectment. If you find that there was no such agreement, or if the evidence of it is not satisfactory to you, being conflicting, the burden being upon the defendant to establish it, then you will find for the plaintiff. With these remarks, gentlemen, I will leave the case with you.

The following points are reserved: (1) Whether the alleged agreement to permit the defendant to remain for another year, as stated by the defendant, is not nudum pactum; (2) Whether the evidence of the agreement, stated in the first point, is sufficient in law to warrant the court in submitting the case to the jury.[4]

The jury returned a verdict in favor of the defendant and assessed the damages at the sum of $200. A rule for a new trial being subsequently discharged, judgment was entered on the verdict and on the questions reserved in favor of the defendant. The plaintiff then took this writ, assigning as error:

1. The admission of defendant's offer.[1]

2, 3. The parts of the charge embraced in [ ] [2] [3]

4. The entry of judgment for the defendant on the questions reserved.[4]

*Mr. George E. Darlington*, for the plaintiff in error:
Cited: Koenig v. Bauer, 57 Pa. 168.

*Mr. V. Gilpin Robinson* (with him *Mr. Horace P. Green*), for the defendant in error:
Cited: Swartz v. Hauser, 10 W. N. 435; Unangst v. Kraemer, 8 W. & S. 391; Louchheim v. Henzey, 9 W. N. 571.

OPINION, MR. JUSTICE MITCHELL:

The fourth assignment of error raises the only points of law in the case, viz.: whether an agreement to allow the tenant to remain another year was nudum pactum, and whether there was sufficient evidence of such agreement to go to the jury. The circumstances were briefly these: A tenant having received from the landlord's agent the required three months' notice to quit, went to the landlord himself, and was told in effect, "If you want to stay you can stay."

That such a conversation may amount to an agreement is not denied, and we do not see any difficulty about the consideration. It is argued that the tenant, having made no promise to stay, could not be held; and therefore the landlord should not be. But there was evidence on which a jury could have held the tenant. If A. asks B. to do a certain thing for him, and B. assents, it is not necessary for A. to make a promise to pay in express terms; his preceding request is sufficient evidence of consent to bind himself as well as the other. Moreover, the situation of the parties was this: A lease was in existence which bound both until notice was given to terminate it. Notice was given; the tenant in effect asked the landlord to withdraw it, and the landlord assented. The notice being withdrawn, both parties were remitted again to the lease whose mutual covenants were sufficient consideration.

But there was evidence of an express promise by the tenant as well as the landlord. Timothy testifies: "I went to see Mr. Tobias, and told him all about it, and Tobias said, No, if you want to stay, John, you can stay on there.". . . . "A week or so afterwards I met Mr. Supple, . . . . I told him that I would stay on; I told him I had seen Mr. Tobias, and that he told me I could stay on there." With this evidence the judge could not have refused to submit the case to the jury.

Was it error to say to the jury, as complained of in the second assignment, that "the testimony is about equally balanced?" The balance of testimony depends on very many things. It cannot be measured by numerical count of witnesses. It is largely influenced by their manner, their readiness and confidence in testifying, their opportunities of knowledge, the accuracy of their memory, their apparent truthfulness and impartiality, etc. An important element, too, is

the weight to be given to writings (as in this case the letter of Mr. Tobias), in connection with the circumstances under which they were written. All of these matters are before the trial judge, and it should require a very plain error on his part to justify this court in saying that his right of comment was exceeded. The learned judge in this case said to the jury in this connection, " It is therefore his (the tenant's) duty to prove to your satisfaction that this agreement was made. . . . The proof of that agreement must be satisfactory to the jury. The testimony is about equally balanced. The defendant alleges that the landlord did agree that he should stay on at the same rent; the landlord most emphatically denies that any such agreement ever was made." He then goes on to give the jury some very clear and correct suggestions as to the weighing of conflicting testimony, and calls their attention in accurate and positive language to the law that " a mere conversation is not an agreement," etc. The expression that " the testimony is about equally balanced," taken in its proper connection, in a charge that as a whole was decidedly favorable to the plaintiff, cannot be justly complained of by him now.

The first and third assignments relate to the evidence upon the damages. The jury were charged that " in ascertaining the damages you must depend on the testimony, and not decide the case from mere supposition. The defendant could not . . . . . sacrifice his goods and charge the plaintiff with the difference. . . . . It was his duty to do the best he could with his property, and if he wanted to hold the plaintiff for the difference . . . . . he should have given him notice. . . . . If they were sold they should be sold at the very best price that could be obtained, and he should so prove to you, and the difference between the real value and what they sold for would be the proper measure of damages. This does not appear to have been done. He called in a couple of friends and they put a valuation, not upon the property but upon the damages. . . . . That mode of ascertaining the damages is very unsatisfactory and improper. You must have evidence of the loss he suffered from the deprivation of the use of his property, and you should find that from the evidence. You will have to assess them as best you can if you find there was an agreement." Certainly the plaintiff in error cannot com-

plain of this charge as a matter of law. Some expressions, taken apart from their connection, are loose enough to allow the jury to guess at a verdict, but the jury were twice expressly told they could not do that, but must find the damages proved by the evidence, and the charge, as a whole, gave them the correct rule by which damages were to be measured.

The only question, therefore, is whether there was any evidence on which the jury could apply the rule given them. The evidence was loose and unsatisfactory, as the court below said, but we cannot say there was none. Timothy himself stated his damages in round figures at $1,000, and gave the facts on which he based his estimate—the stock that he had, cows, horses, agricultural implements, etc., their cost and value, the stress he was put under to sell them, and the prices realized. Grogan, whose testimony is specially excepted to, had been called upon by defendant to make a valuation, and it appeared that he had valued the loss instead of the goods themselves. The jury however were instructed in the charge, that this was not the proper mode of ascertaining damages. Grogan also testified to the number of cows, etc., and in a general way to their value. This part of his testimony was certainly competent, and it was to this, and the similar evidence of Timothy, that the learned judge referred the jury, when, after giving them the rule of law, he said, "you will have to assess them (the damages) as best you can." Taken by itself this expression would be inadequate and misleading, but taken in its proper connection, it was meant, and must have been understood by the jury, to refer them to evidence which was clearly and properly in the case.

On the whole there was no error in submitting the case to the jury, or in the mode in which it was done. If the jury made a mistake either in their verdict, or its amount, it was for the court below, not for us, to correct it.

The judgment is affirmed.