## DIAMOND CATTLE CO. v. CLARK

(No. 1994; December 23, 1937; 74 Pac. (2d) 857)

(Rehearing denied March 22, 1938)

For the plaintiff in error there was a brief by *Corthell, McCollough* and *Corthell* of Laramie, Wyoming, and oral argument by *N. E. Corthell.*

For the defendant in error, there was a brief and oral argument by *J. R. Armstrong* of Rawlins.

*Corthell, McCollough* and *Corthell* in reply.

KIMBALL, Justice.

This is a proceeding in error for review of a judgment on a verdict finding for plaintiff in an action for damages. Defendant in error's motion to dismiss the proceeding was heard at the time of the hearing of the case on the merits.

The motion to dismiss is on two grounds: (1) that the petition in error fails to describe with reasonable certainty the cause wherein the errors are alleged to have occurred, and (2) fails to describe with reasonable certainty the judgment to be reviewed, as required by Rule 10 (42 Wyo. 532). Rule 10, in effect since December 1, 1909, provides, among other things, that "the petition in error shall distinctly set forth each of the errors complained of, describing with reasonable certainty the cause wherein the errors are alleged to have occurred, and the judgment or final order to be reviewed."

In the first paragraph of the petition in error it is alleged that "there is error prejudicial to the rights of plaintiff in error in the record and proceedings of the district court within and for the County of Carbon, in the cause wherein Neil Clark was plaintiff and the Diamond Cattle Company was defendant, in this, to wit:" Then follow the assignment of errors and the prayer, from which we think it appears with reasonable certainty that the judgment to be reviewed was entered on a verdict in favor of defendant in error (plaintiff below) on the first cause of action set forth in his petition. The judgment is not otherwise described.

We are of opinion that the first paragraph of the petition in error contains a sufficient description of the cause by stating the court and the parties to the action (Riordan v. Horton, 16 Wyo. 363, 94 Pac. 448), but think the petition is defective in failing to state the date of the judgment. See Commissioners v. Shaffner, 10 Wyo. 181, 189, 68 Pac. 14, Riordan v. Horton, supra.

The statute (89-4805, R. S. 1931) by a provision which became a part of it by an amendment of 1917 (Laws 1917 Ch. 70) contemplates that the petition in error shall show the date of the judgment, for it is there provided that the summons in error shall contain, among other things, a statement of the court in which the judgment was given or made, with the date thereof and the title of the case appealed from, "as the same are stated in the petition in error."

During the argument on the motion to dismiss, we were of opinion that the petition in error was defective in failing to describe the judgment, and it was then understood that plaintiff in error would apply for leave to cure the defect by amendment. Defendant in error contended that, as the time for commencing a proceeding in error had expired, the amendment should not be allowed. The motion, with the incidental question of the right to amend, was taken under advisement.

We have no doubt that an amendment giving the date of the judgment is in furtherance of justice, and should be permitted under Section 89-1063, even after the time for bringing a proceeding in error has expired. The original petition in error is sufficient to give this court jurisdiction of the proceeding. An amendment giving the date of the judgment will not substitute a different judgment for the one originally complained of. It is not contended that the record from the district court returned pursuant to the order of this court is not the record of the cause described in the petition in error. The record shows but one judgment, which is on the verdict and evidenced by a transcript of a journal entry dated April 4, 1936. It is clear that the defendant in error could not have been misled as to what judgment he was required to defend, and could not be prejudiced by an amendment alleging its date. A similar amendment under like circumstances was allowed in Riordan v. Horton, supra. See, also, North

Laramie Land Co. v. Hoffman, 27 Wyo. 271, 195 Pac. 988.

In accordance with the understanding at the time of the argument of the motion, plaintiff in error has made written application for leave to amend. Paragraphs numbered seven and eight of the assignment of errors are as follows: "7. The judgment of the court upon the first cause of action is not sustained by sufficient evidence," and "8. The judgment of the court upon the first cause of action is contrary to law." The application is for leave to amend by interlineation by inserting after the word "judgment" in each of these paragraphs the words "comprising the concurrent journal entries bearing date April 4, 1936."

The amendment will be allowed, though it seems that it will leave the petition in error still subject to technical objections. The proper and usual place for the description of the judgment is in what we have called the "formal part of the petition," and not in the assignment of errors, but we do not hold that a description contained in an assignment of errors is not a sufficient compliance with the rule. See Hall Oil Co. v. Barquin, 28 Wyo. 151, 154, 155, 201 Pac. 160. We do not understand the purpose in alleging that the judgment "comprises concurrent journal entries." As we have said, there is but one judgment in the record. It is evidenced by one journal entry dated April 4, 1936. The only other journal entry bearing that date is an order denying motions for judgment notwithstanding the verdict and for a new trial.

We think, however, that the requested amendment makes the petition in error comply substantially with the rule. Indeed, if other matters shown by our records had been called to our attention when the motion was heard, we doubt that we should have thought an amendment necessary. The statute (89-4808) provides that the plaintiff in error shall file with his petition in error

an application for an order for the papers that become part of the record in the case in the Supreme Court. The plaintiff in error filed with his petition in error an application under this section, describing the judgment to be reviewed as "a judgment rendered in the District Court of the County of Carbon on the 4 day of April, 1936, in a cause wherein Neil Clark was plaintiff and Diamond Cattle Company, a corporation, was defendant." A similar description of the judgment is contained in the summons (issued July 2, served July 11, and filed July 15, 1936) and in the order for the record. It would seem that the failure of a petition in error to give the date of the judgment is an immaterial defect when the date is stated in an application filed at the same time, in the summons and in the order for the record. See Hillebrant v. Brewer, 5 Tex. 566. The motion to dismiss will be denied.

Defendant in error contends that the certificate to the bill of exceptions is defective in failing to recite that the bill contains all the evidence, and, therefore, the record is insufficient to permit a consideration of questions that relate to the sufficiency of the evidence. The certificate above the signature of the trial judge at the end of the bill recites:

"And now, on this 24th day of April, 1936, the defendant having reduced its exceptions to writing, and presented this its Bill of Exceptions to the Court, and the court having duly examined the same, and finding that the exceptions are therein truly alleged, doth now allow, sign and seal the same, and order that it be made a part of the record in the cause, but not spread at large upon the Journal.

"Done in open court this 24th day of April, 1936."

This certificate showing that the bill was presented in time, allowed, signed and made a part of the record, is sufficient to authenticate all the statements of the bill. In the bill, following the transcript of the evi-

dence, it is recited: "Be it further remembered that the foregoing was all the evidence given or offered by either party on the trial of said cause." This is the approved method of showing that the bill contains all the evidence. See Boulter v. Cook, 31 Wyo. 373, 388, 226 Pac. 447. It is true that in some of our cases there may be found expressions indicating that the fact that the bill contains all the evidence should be recited in the concluding certificate. See Howard v. Bowman, 3 Wyo. 311, 23 P. 68; Davis v. Minnesota Baptist Convention, 45 Wyo. 148, 164, 16 P. (2d) 48. But these cases were examined in Fryer v. Campbell, 46 Wyo. 491, 496-497, 28 P. (2d) 475, where we said that the so-called final certificate establishes the verity of the recitals of the bill, and cited Boulter v. Cook, supra, as making this point clear. The concluding certificate to the bill in Boulter v. Cook, set out in the opinion at p. 378, of 31 Wyo., showed merely that the bill was presented with a prayer that it be allowed and signed, and that it was allowed and signed within the time given for presenting it. It was held that the certificate was sufficient in form and substance to attest the correctness of the recitals of the bill. The court speaking through Chief Justice Potter said (at p. 388) : "It is not necessary that the fact that the bill contains all the evidence and exceptions shall be expressed in the concluding certificate declaring the bill to be allowed. Such certificate is not a separate or independent document; *it is a part of the bill,* and attests the correctness of its recitals. The bill in this case, preceding the part called the certificate, states that it contains all the evidence and exceptions. Where the evidence is necessary the fact that the bill contains all the evidence must be shown by the bill itself, but not necessarily in the concluding certificate. Nor, indeed, is that usually the proper place for it."

In the opinion in Fryer v. Campbell, supra, we men-

tioned the fact that the certificate in that case recited that the judge signed the bill as a "true bill of exceptions," but it should not be understood that we held that that recital was necessary to authenticate the bill. There was no similar recital in the certificate approved in Boulter v. Cook, supra. In Hardin v. Card, 14 Wyo. 479, 85 Pac. 246, it was contended that the certificate to the bill of exceptions was insufficient because the judge certified only as to the evidence and not the exceptions, and Potter, Ch. J., in disposing of this contention said: "The signature of the judge to the bill allowing it and ordering it to be filed as a part of the record authenticates all the statements of the bill." The statute (§ 89-4704, R. S. 1931) does not require any particular form of certificate of a trial judge to a bill of exceptions. It provides for presentation of the bill (called the "writing") which, if it is true, must be allowed and signed by the court or judge, and filed with the pleadings as a part of the record. Authorities from other jurisdictions seem in accord with our cases in holding that under such a statute the allowance and signing of the bill attests the correctness of its recitals. See McCormick Harvesting-Machine Co. v. Gray, 114 Ind. 344, 16 N. E. 787; York v. Nash, 42 Ore. 321, 71 Pac. 59; 3 Enc. Pl. & Pr. 458.

In the spring of 1932, plaintiff leased from defendant a large tract of farming and grazing land in Carbon County, Wyoming, for the term of five years from May 1, 1932. The lease provided that: "The lessor reserves the privilege, in the event of sale of the leased lands or any part thereof, to cancel and terminate this lease at the expiration of any lease year, giving ninety days written notice of such cancellation."

On January 30, 1933, Mrs. Bosler, defendant's president and active business manager, sent to plaintiff a written notice that certain parts of the leased land had been sold, and that defendant would terminate the

lease on or at the expiration of the lease year, April 30, 1933. The plaintiff, acting on the notice, removed from the leased land May 8, 1933.

In October of the following year, plaintiff commenced this action for damages. In his first cause of action he alleged that January 30, 1933, defendant "falsely and with wrongful intent did notify the plaintiff that certain parts of the leased land had been sold; * * * that plaintiff relied upon and believed that said notice had been given in good faith, and believed that defendant had sold part of the land leased to him, as represented by the defendant in said notice, and that on or about April 30, 1933, the defendant then and there did wrongfully take possession" of the leased premises; that the notice of termination "was not given in good faith or with an honest intent; that said statement that part of the land had been sold was false and fraudulent"; that defendant had not sold any part of the leased land; that said notice of termination was given for the "sole purpose of evicting and ousting the plaintiff and defrauding him of the rights under the said lease, and repossessing itself of the said premises four years before the lease thereof to plaintiff would otherwise terminate; that the plaintiff was thereby permanently deprived of the beneficial use and enjoyment of the whole of the said premises by the intentional, wrongful and fraudulent act of the defendant." Allegations of damage will be noticed later. The second cause of action was for damage caused by defendant's alleged interference with plaintiff in the irrigation and farming of the leased land during the time plaintiff was in possession. The verdict and judgment in plaintiff's favor on that cause of action are not challenged, and will receive no further notice.

The answer admits the giving of the notice of January 30, 1933; "that plaintiff relied upon and believed that said notice had been given in good faith and be-

lieved that the defendant had sold part of the land leased to him, as represented by the defendant in said notice," and that defendant took possession of the leased premises after plaintiff removed therefrom. It denies that the notice of cancellation was given to plaintiff "falsely and with wrongful intent," and denies that the subsequent taking and retention of possession of the premises by defendant was wrongful.

The defendant owned a large body of land of which the land leased to plaintiff was only a part. All the land was encumbered by mortgage or trust deed. There was evidence of bickerings between Mrs. Bosler and plaintiff during the summer of 1932 in regard to the way plaintiff was farming the irrigated lands included in the lease. A witness for plaintiff testified that in the fall of 1932, Mrs. Bosler said that plaintiff did not know how to run a ranch, didn't know how to raise hay, and that she had determined that he should get off the ranch.

Defendant contended that the sale of a part of the land included in plaintiff's lease, as stated in the notice terminating the lease, was made for defendant, acting through Mrs. Bosler, to Frank Dobson, on January 28, 1933. Mrs. Bosler testified that Mr. Dobson after having several times spoken of buying some land, called to see her on January 28, and made a written offer to purchase. The writing was typed by Mrs. Bosler and signed by Dobson. Dobson offered to buy certain described land, including a small part of the land leased to plaintiff, and to pay therefor $25000. One hundred dollars was paid as "earnest money," and the balance of the purchase price was to be paid in annual installments of $1250, with 5% interest on deferred payments. It was recited that "if this offer is accepted and I should fail to sign necessary papers the Diamond Cattle Company may retain the earnest paid herewith to secure it from damages, and I am further released

from payments as herein agreed." It was further recited that Dobson should have possession of the property May 1, 1933. Mrs. Bosler gave no written acceptance of the offer, but both she and Mr. Dobson testified that she accepted it orally, and kept the $100 earnest money. Mrs. Bosler was about to leave home for a month, and told Mr. Dobson that as soon as she returned, or as soon as was convenient, "a contract would be entered into." Before leaving she wrote and mailed the notice of termination of plaintiff's lease.

On April 28, 1933, Mrs. Bosler and Mr. Dobson had a final conference, and, in the language of Mrs. Bosler, "entered into a contract," which was then reduced to writing. The writing consists of five closely typed pages. The contract was between defendant party of the first part, and Frank Dobson, heretofore mentioned, and his brother, W. A. Dobson, parties of the second part. The land, with slight variations, was described as in the offer of January 28. The purchase price was $24,500, and the payment of $100 thereon was acknowledged. The rest of the purchase price with interest was to be paid on or before May 1, 1953. Each year the parties of the second part were required to pay on the purchase price the market value of one-half the hay raised on the land. There were numerous other promises by the parties of the second part: to keep the buildings insured for the benefit of the party of the first part and the holders of mortgages; to keep the dwelling house occupied; to make repairs; to irrigate and farm the land in a workmanlike manner, and so forth. It was provided that until the annual payments computed on the value of the hay, were made, the legal title to, and right of possession of, all hay grown on the land should be in the party of the first part, as owner. It was further provided that if the parties of the second part should make default in any agreement to be performed by them, the contract of sale should

become null and void at the option of the first party, and payments theretofore made, and all improvements then on the lands, should belong to the party of the first part and retained by it as rent. This provision was followed in the original writing, by an alternative provision which gave the party of the first part the right, on such default, to declare the entire sum then unpaid to be immediately due and payable, and in case it was not paid, to have judgment therefor. This alternative provision, as shown by the writing in evidence, was struck out.

It was further provided that no assignment of the contract by parties of the second part should be valid unless in writing and consented to by party of the first part in writing.

The contract recites that parties of the second part accept notice that the land is included in a trust deed and also in a mortgage given by party of the first part, and that the parties of the second part agree that the trust deed and mortgage may be extended, renewed or foreclosed "provided that at all times parties of the second part shall be protected in its interest hereunder, and when they have complied with the terms hereof and shall have paid the moneys due under this contract to [the successor to the trustee and mortgagee] said land shall forthwith be fully released from any liens of said trust deed and mortgage * * *. By its official execution hereof said [successor to the trustee and mortgagee] hereby consents to the terms of this contract and agrees that said land shall be released from the lien of said trust deed and mortgage when the terms hereof are fully complied with by party of the second part."

The contract is dated April 28, 1933, but was not signed until about May 15, 1933. There is nothing to show why W. A. Dobson became a party, and when we

refer to Mr. Dobson we mean Frank, who apparently conducted all negotiations.

The contract was never signed by the company (a Minneapolis Trust Company) mentioned as the successor to the trustee and mortgagee. It was expected that Mrs. Bosler would procure this signature, but she did not do so. She explains this, by saying she was waiting until she should have occasion to go to Minneapolis. Mr. Dobson received his copy of the contract, lacking this signature, and made no objection on account of the omission. He testified, however, that he would not have continued to make payments on the purchase price unless the mortgages were to be released. This matter probably did not assume any importance in his mind, as he soon escaped from the obligations of the contract by abandonment about to be mentioned. He did not take possession of all the land described in the contract of sale. A part of the land was leased on April 30, 1933, with his consent, by the defendant to one Dixon for the term of five years from May 1, 1933. In making this lease the defendant apparently contracted as the owner of the land. Dobson received none of the rent.

According to the testimony of Mr. Dobson, who was a witness for defendant, his attitude with reference to going on with the purchase underwent a change in the summer or fall of 1933 because of conditions that made it difficult for him to procure money to make payments under the contract and caused him to feel uneasy in regard to the supply of water for irrigation. This change in attitude was made known to Mrs. Bosler, who said she "could not press him to go on if he felt that way." Later, the contract of sale was abandoned by consent, and on May 1, 1934, Dobson gave up the land, having paid on the purchase price $100, and the value of one-half of one year's hay crop, which the jury may have believed did not exceed the rental value of

the land for the year. Mr. Dobson testified that he did not think he lost anything by abandoning the land in 1934. The plaintiff testified that in the fall of 1933 Dobson said he had not bought any of the Diamond land.

The instructions on the question of defendant's right to give the notice of cancellation need not be quoted in full. The jury were told that plaintiff claimed that the representation that part of the leased land had been sold "was false and untrue"; that no sale had been made, and that defendant acted wrongfully in giving the notice. Whether a sale was made, was declared to be a question for the jury to decide from all the evidence. It was stated that defendant had the right to cancel the lease by giving 90 days notice "in case of a sale of all or any part of the leased land," and that "if the purported sale to Dobson was genuine, and the sale was actually made" the plaintiff could not recover. The word "sale," as used in the lease, was defined as "either a completed sale, where a conveyance of the land has been made," or a contract of sale "actually entered into whereby the seller agrees to sell the land and the purchaser agrees to buy it, on certain terms and at a certain price, on the completion of which payments the seller agrees to convey to the purchaser the land described in the contract." It was added that "unless a contract of sale had been actually entered into for the sale of the land at the time the notice was given, there was no sale within the meaning of the term as used in the lease, and that mere negotiations for a sale, no matter how long continued, would not constitute a sale if no contract of sale had actually been entered into." Referring to the Dobson's offer January 28, 1933, and defendant's alleged acceptance thereof, it was stated that in order for an offer and acceptance to constitute a contract, the acceptance must be "unconditional and unqualified." Another instruction declared that if a

sale actually took place on January 28, 1933, the fact that the terms thereof were later changed and embodied in another instrument did not invalidate the sale as far as the right to give the notice of termination of the lease was concerned. It was further declared that "if the contract of sale was actually entered into, it would make no difference that it was afterwards abandoned." Further: "that in order to constitute a defense the sale must be a bona fide sale, made in good faith, and must not be fictitious or a mere sham or pretense, nor designed merely as a scheme to deprive the plaintiff of the enjoyment of the lease and dispossess him of the land embraced therein."

In view of the evidence, the substance of these instructions may be briefly stated thus: the plaintiff should recover if the jury found that defendant, on January 30, 1933, had not entered into an actual, bona fide contract to sell to Dobson a part of the land leased to plaintiff. The jury were also instructed, if they found for plaintiff, to answer this question: "Did Mrs. Bosler believe that a sale had been made to Dobson when she gave the notice of January 30, 1933, to Clark?" The answer was "no."

Defendant insists that this is a common law action of deceit in which it was necessary for the plaintiff to allege and prove not only that the representation of sale was false but also that Mrs. Bosler at the time knew it was false. On this ground, defendant questions the sufficiency of the petition, the instructions and the evidence.

The petition was not attacked by motion or demurrer. It contains no specific allegation that the representation was made with knowledge of its falsity. It does allege that the representation was false, not made in good faith or with honest intent, and that it was fraudulent. These allegations were sufficient in the absence of challenge by demurrer or motion, even if

the action must be treated as an action of deceit. See 27 C. J. 33-34; Neilson v. Masters, 72 Ore. 463, 143 P. 1132, and cases cited.

It is contended that the court erred in refusing to give an offered instruction stating the elements of an action of deceit, and telling the jury that it was necessary for plaintiff to prove all of them by a preponderance of the evidence before he could recover. Still assuming that this is an action of deceit, we think the defendant was not prejudiced by the refusal to give the instruction. As to several of the elements of fraudulent misrepresentation, there was no contest. There was no doubt that the representation was material and that it was made to cause plaintiff to vacate the leased land, which he did in justified reliance on the truth of the representation. There was no necessity for a finding of the jury to establish these facts. The material issue was whether the representation was false, and this the jury could not have failed to understand. If it be conceded that it was necessary for plaintiff to prove that Mrs. Bosler knew the representation was false, we believe the error in failing so to instruct was immaterial, in view of the special finding that Mrs. Bosler, when she gave the notice of cancellation, did not believe that a sale had been made.

Indeed, we are not prepared to hold that this is an action of deceit in which it was necessary for the plaintiff to establish that the representation was made with knowledge of its falsity. There are many actions in which the plaintiff may recover because he was deceived by a misrepresentation which the maker may have believed to be true. See Williston on Contracts, §§ 1503-1508. We think the authorities (see Lumbers v. Gold Medal etc. Co., 30 Can. S. C. 55) intimating that an action of this kind is controlled by the strict rule of Derry v. Peek, 14 A. C. 337, overlook the fact that that case was the ordinary action of deceit, and

was not intended to govern cases of misrepresentations by those who, by contract or because of the relation of the parties, were under a duty to give correct information. See, Salmond on Torts (9th ed.) 611; Barley v. Walford, 9 Q. B. 197, 208; Nocton v. Ashburton (1914) A. C. 932. "If there be a right to have true statements only made, this will render liable to an action those who make untrue statements, however innocently." Lord Herschell in Derry v. Peek, at p. 362.

The defendant, in giving the notice of cancellation, was acting under the clause in the lease that gave it the right to terminate the lease "in the event of sale" of a part of the premises. This clause does not mean that the lease could be terminated when defendant believed it had made a sale, though that would be the effect given to it in this action if the strict rules of an action of deceit must be applied. The petition, with the allegation of fraud eliminated, charges the defendant with a wrongful act in giving the notice of cancellation falsely representing the fact (a sale of a part of the land) which by the terms of the lease was a condition precedent to the right to give the notice. Thus considered, the cause of action, as plaintiff contends, would seem to be an action for damages for eviction caused by defendant's violation of its duty to speak the truth when it gave the notice. The additional allegation that the misrepresentation was made fraudulently might be disregarded, on authority of analogous cases. See, Gartner v. Corwine, 57 Oh. St. 246, 48 N. E. 945; Booth v. Northrop, 27 Conn. 325; Nocton v. Ashburton, supra. In Nelson v. Goddard, 162 Wis. 66, 155 N. W. 943, an action like the one at bar, there was no allegation or finding of fraud as distinguished from mere misrepresentation. In Andrews v. Connick, 209 N. Y. Supp. 6, 209 App. Div. 161, it was held that the jury might have found for plaintiff on the ground that there had been no sale of the premises as contemplated by

the lease, and that the trial court erred in submitting the case on the theory that unless the plaintiff established fraud she could not recover.

There are cases intimating that the plaintiff might have elected to sue on the ground that the landlord in obtaining possession of the property by misrepresentation has violated the lease contract, or to proceed on the theory of fraudulent misrepresentation. See Lumbers v. Gold Medal etc. Co., supra, and s. c. in 29 Ont. R. 75 and 26 Ont. App. 78, discussed as action of deceit which the plaintiff sought to change to an action for breach of covenant of quiet enjoyment; Pierce v. Mountain Lion etc. Co., (Wash.) 49 P. (2d) 23, where it is said the plaintiff elected to try the case as one for breach of contract rather than as one for fraud and deceit.

Defendant argues that by the manner in which the case was submitted to the jury, an action of deceit was converted into an action for breach of contract, and contends that it could not be the latter because the lease contains no covenant of quiet enjoyment, and under our statutes the covenant cannot be implied. The statutes are section 97-101, R. S. 1931, which declared that the term "conveyance" shall be construed to embrace every instrument in writing by which any interest in real estate is created except, among other things, "leases for a term not exceeding three years," and section 97-107 providing that "no covenant shall be implied in any conveyance of real estate." Whether a lease for more than three years, which is a conveyance within the definition of section 97-101, is a "conveyance of real estate" within the meaning of section 97-107 is a question on which cases construing similar statutes are not in accord, and which need not be decided in this case. See, Koeber v. Somers, 108 Wis. 497, 84 N. W. 991, 52 L. R. A. 512; Fifth Ave. Bldg. Co. v. Kernochan, 221 N. Y. 370, 117 N. E. 579. Where it is held that under

such statutes there can be no covenant of quiet enjoyment implied in a lease, it is also held that no such covenant is necessary to impose on a lessor the duty not to interfere by his own acts with the right of possession granted by the lease. Koeber v. Somers, supra, p. 502-503. And see Manning v. Galland-Henning etc. Co., 141 Wis. 199, 204, 124 N. W. 291. The object of a covenant for quiet enjoyment is to protect the lessee from the lawful claims of third persons having title paramount to the lessor (2 Platt on Leases, 288; Fifth Ave. Bldg. Co. v. Kernochan, supra). It may also be relied on for protection of the lessee against unlawful disturbance by the lessor himself (New York v. Mabie, 13 N. Y. 151, 156), but is not necessary for that purpose. The lessee may disregard the covenant and sue in an action of tort for eviction. Mitsakos v. Morrill, 237 Mass. 29, 129 N. E. 294, and authorities cited. If it be granted that, because of our statutes, no covenant of quiet enjoyment can be implied in the lease, it would not follow that the plaintiff could not sue on the theory of eviction by wrongful act of his landlord. The action on this theory would be in tort though the contract is relied on to show the right of the tenant and the duty of the landlord. In our view, the action was not "converted" from one theory to another. The petition alleged the facts on which plaintiff relied. It was not necessary for the plaintiff to label his action. See, E. & F. Construction Co. v. Stamford, 114 Conn. 250, 158 Atl. 551; Williston on Contracts, § 1501. If the facts alleged gave the plaintiff the right to recover on the theory of eviction by deception, and also, because of the charge of fraud, stated a cause of action of deceit, it might be argued that the petition stated two causes of action, but no objection to the petition was made on that ground, and there was no motion to require the plaintiff to elect between two causes of action. See E.

D. Metcalf Co. v. Gilbert, 19 Wyo. 331, 116 Pac. 1017; Gartner v. Corwine, 57 Oh. St. 246, 48 N. E. 945.

While it is said that a clause in a lease giving the lessor the option to cancel the contract before the expiration of the term should be construed strictly against the lessor (Woods v. Postal Telegraph-Cable Co., 205 Ala. 236, 87 So. 681, 27 A. L. R. 834; Weddle v. Parrish, 135 Ore. 345, 295 Pac. 454; 35 C. J. 1055; 16 R. C. L. 699, § 188), and there are dicta indicating that the word "sale" as used in a clause like that in the case at bar, means a sale completed by conveyance of title (Ela v. Bankes, 37 Wis. 89; Aydlett v. Pendleton, 114 N. C. 1; Lewis v. Agoure, 8 Cal. App. 146, 96 Pac. 327; Cross v. Ramdullah, 274 Fed. 762), there are a number of cases holding that an agreement of sale as distinguished from a completed sale is sufficient. See Luse v. Elliott, 204 Ia. 378, 213 N. W. 410, and cases cited. The transaction, whether a completed sale or a contract to sell, must be in good faith. See Pefkaros v. Harman, 20 Del. Ch. 238, 174 Atl. 124, and cases cited. In an examination of the authorities cited by counsel, and many others, most of which are collected in note 35, A. L. R. 518, we have seen no case in which it was decided that under a similar clause the notice could be given before an agreement had been reached as to the terms of an actual contract to sell. See Russell v. Coggins, 8 Ves. 34; Scheele v. Waldman, 121 N. Y. Supp. 486; Hudson & M. R. Co. v. Mayers, 190 N. Y. Supp. 891; Golden Cycle Mining Co. v. Rapson Coal Mining Co., 188 Fed. 179. The notice cannot be given merely because negotiations are pending that may result in a contract of sale (Bellone v. Kleinau, 54 Cal. App. 428, 201 Pac. 977; Andrews v. Connick, 204 N. Y. Supp. 6) or because the lessor has given a mere option to purchase which may or may not be exercised (Cincinnati-Louisville Theater Co. v. Masonic etc. Home, 272 Fed. 637).

We are of opinion that the court in instructing the jury that the lease could be canceled by notice given after an actual, *bona fide* contract to sell had been entered into, gave to the cancellation clause as liberal an interpretation in favor of the defendant as was justifiable. Defendant argues that the instructions invited the jury to find for plaintiff on the theory that the contract which it claims was entered into on January 28 by Mrs. Bosler's acceptance of Dobson's offer was "invalid," in the sense that it could not have been enforced in an action for specific performance, and cites authorities holding that a lessor having the option to cancel a lease on sale of the property, may give the notice on entering into a contract of sale that is afterwards executed, though the contract would have been unenforceable under the statute of frauds or because the consideration was invalid. See Luse v. Elliott, 204 Ia. 378, 213 N. W. 410; Yontz v. McDowell, 197 Ky. 770, 247 S. W. 948. The importance of this point is because of the fact that when the notice of cancellation was given the "sale" therein referred to was an oral acceptance of an offer. It is true that plaintiff contended that a contract to sell was not ground for cancelling the lease unless the contract was valid and enforceable as between the parties, and offered instructions on that theory. But these instructions were refused, and the given instructions contain nothing to lead the jury to attach any significance to the fact that there was no written evidence that Mrs. Bosler had accepted Dobson's offer when the notice of cancellation was given. It may be noted in passing that it was said in Luse v. Elliott, supra, that the fact that a lessor chooses to recognize by performance a contract that could not have been enforced against him is a circumstance tending to show bad faith.

One of the instructions contains the abstract statement that if a lease provides for its termination in the

event of sale, "such sale, in order to terminate the lease, must be strictly within the conditions provided for * * * and if there is any doubt as to the meaning and effect of these conditions the lease is to be most strongly construed against the lessor." It is not contended that the statement is incorrect, but it is said that the instruction seems to leave to the jury the question of interpreting the lease, which, being free from ambiguity, should have been interpreted by the court. See Bosler v. Coble, 14 Wyo. 423, 447, 84 Pac. 895. We concede that the lease was free from any ambiguity that could have been explained by extraneous circumstances, and that it was the duty of the court to interpret it. The court did this. The criticized language was merely preliminary and incidental to the interpretation of the lease by the court, and, in our opinion, did not leave any question of interpretation to the jury.

We do not think it necessary to discuss other criticisms of the instructions on the question of defendant's liability. Under the evidence, the issue was fairly simple. The "sale" referred to in the notice of cancellation was the offer and acceptance of January 28. The question was whether that constituted a bona fide contract to sell within the meaning of the cancellation clause of the lease. The issue was stated to the jury in language which they could not have misunderstood. The trial judge, in our opinion, would have been warranted in instructing the jury that the offer and acceptance of January 28 was neither a sale nor a contract to sell. The transaction, so far as Dobson was concerned, was probably no more than an agreement to sign a contract to purchase, or to forfeit the $100 earnest money. It might be described as an option for which the earnest money was the consideration. See Bennett v. Egan, 23 N. Y. Supp. 154, 3 Misc. 421; Cincinnati-Louisville Theater Co. v. Masonic etc. Home, 272 F. 637, 640. It was agreed that if Dobson "should

fail to sign necessary papers" defendant might retain the earnest money and Dobson was "further released from payments." The terms of the sale, except as contained in the offer, were not then agreed upon. Mrs. Bosler's acceptance was qualified by the statement that later "a contract of sale would be entered into." A comparison of the offer of January 28 with the "contract of sale" dated April 28, makes it clear that many important terms were not agreed upon until the latter date. Thus it would seem that the offer and acceptance of January 28 (the "sale" mentioned in the cancellation notice) did not make a contract, but were mere preliminary negotiations. See Restat. Cont. §§ 26, 60; Williston on Contracts, §§ 45, 77.

If we should be wrong in what we have just said, and should concede that there was a jury question that might have been decided in favor of defendant on the ground that by the offer and acceptance of January 28, the parties entered into a contract of purchase and sale, we should hold that the evidence was sufficient to support the finding for plaintiff on that issue. On the question of fact, we may assume the jury had the right to consider not only the offer and acceptance of January 28 but also all the other evidence that would throw light on the subject. They might have believed that Mrs. Bosler had expressed a resolution to get plaintiff off the land. The offer and acceptance of January 28 were followed by the contract of April 28 which contains many provisions that would be more at home in a lease. The alleged purchasers' possession of the land was like that of a tenant, payments on the purchase price were like rent, and the purchasers were denied the right of transferring the contract without the vendor's consent. A provision giving the vendor the right to collect the full purchase price was struck out of the writing, which perhaps left the contract susceptible of being construed as a lease with a mere option to pur-

chase. At any rate, all that was necessary to convert the purported contract of sale into a lease with option to purchase was resolution on part of the vendor to do what it in fact did, that is, to release the purchasers from their promise to pay installments falling due after they elected to vacate the land. The provision designed to protect the purchasers from the liens of prior mortgages never became binding on the mortgagees. A part of the land never came into possession of the purchasers who permitted defendant to lease it to another for a long term. In the sequel there was no consummated sale, and the purported contract to sell has had the practical effect of a lease for one year.

In view of these circumstances, we think the jury were warranted in finding that the offer and acceptance of January 28 was not a sale, nor intended or believed by defendant to be a sale, within the meaning of the cancellation clause of the lease.

We come to the question of damages. The plaintiff made no allegation or proof of what in pleading are called general damages. The facts alleged in the petition as the basis of the claim for special damages were substantially these. Plaintiff, at the time he took possession of the land leased to him by defendant, borrowed from Wolf Brothers $13200 which plaintiff used to buy some 400 head of range cattle. The loan was secured by a chattel mortgage on the cattle and a real estate mortgage on dwelling property in Cheyenne. The cattle were placed on the leased land and used in the operation of a stockraising business. When plaintiff received the notice of cancellation, he made "extensive search for the next best location to range and graze his said cattle"; that the location found was "open land, unfenced, without adequate feed and with no shelter"; that the land leased from defendant was fenced, with good pasture and adequate shelter. Plaintiff moved his cattle to the new location on May 8, 1933. Between that

date and May 23, there were "severe blizzards" which caused the death of 138 head of the cattle: 36 cows, 100 calves and 2 bulls, of the value respectively of $37.50, $17.50 and $70 a head. During the summer of 1933, Wolf Brothers demanded payment of the mortgages "for the reason that plaintiff was not then in possession of the leased premises," and on December 20, 1933, Wolf Brothers took possession of the surviving cattle and the dwelling property, and sold the cattle "at a time when the market was unduly and greatly depressed, and at a time when in the regular course of business they would not have been sold, with the result that plaintiff failed to recover a reasonable and normal price for said cattle." The cattle sold were 253 cows sold for $4508, 12 bulls for $600 and 105 calves for $1260, total $6368. It was further alleged that as a consequence of said wrongful eviction the established business of the plaintiff was broken up, and plaintiff had suffered a loss of profits. The damages claimed were (1) $3240 the value of the cattle lost in the storms; (2) $5000 for "loss of profits and breaking up of the established business of the plaintiff and the forced sale of said cattle"; (3) $5000 for loss of the dwelling property, and (4) $5000 as exemplary damages.

The answer admitted that the land to which plaintiff moved his cattle was unfenced and that portions of the land leased from defendant were fenced and with adequate shelter, and denied other allegations of the petition pertinent on the question of damages.

Plaintiff testified that, on receipt of the notice of cancellation of the lease of defendant's land, which we hereinafter shall call the Diamond land, he tried to find another place, but could not find one that was agreeable. He leased from one Hall 15 sections of land which we shall call the Hall land. Plaintiff's cattle were moved from the Diamond land to the Hall land on May

8, 1933. The day was cloudy and cold; in the evening there was a storm, a wet driving snow. Thereafter, until about May 23, there were severe blizzards that caused the death of many of the cattle. Later, Wolf Brothers, the mortgagees, took possession of the surviving cattle and the mortgaged real property and sold them for less than their actual value. Other facts will be mentioned below.

By the court's instructions the jury were told that there was not sufficient evidence to justify a verdict for exemplary damages, and that there was no competent evidence of a loss of future profits. The jury were also instructed that plaintiff could not recover damages caused by the "action of Wolf Brothers in constraining or persuading him to surrender the property which had been given to Wolf Brothers as security for Clark's loan," because there was "no evidence that defendant at the time of the notice had any knowledge or reason to believe that such a consequence would ensue from the cancellation of the lease." It would seem that this last instruction would have eliminated the question of damages caused by the sale by Wolf Brothers of the cattle that survived the storms, but in view of other instructions, this one was evidently taken as having reference only to the damages claimed on account of the taking and sale by Wolf Brothers of the dwelling property. By another instruction the jury were told to consider only two items of damages: first, the value of the cattle lost in the storms, and, second, the loss occasioned by the sale of the surviving cattle "at less than the market value."

The jury were required to find separately the different items of damage. They found that plaintiff lost in the storms 25 cows, 50 calves and 2 bulls, of the value per head as alleged in the petition, the total $1952.50. They found the damages to the cattle remaining after the storms $2902 for cows, $315 for calves and nothing

for bulls. These latter amounts evidently were what the jury believed was the difference between what the cattle were worth and what Wolf Brothers sold them for.

Defendant requested an instruction that there was no competent evidence that any of the damages claimed were the "proximate, natural result of any action by defendant." In support of the contention that this instruction should have been given, it is argued that the storms were unusual at that season, and that neither the storms nor other factors that contributed to the loss of the cattle could have been anticipated by defendant when it gave the notice that caused plaintiff to vacate the leased land.

We consider first the contention as applied to the cattle killed by the storms. There was evidence from which the jury must have believed that defendant knew that plaintiff was making use of the Diamond land as a place to keep his cattle. The cattle were range stock for which the Diamond land contained ample shelter—trees, brush, gullies and bluffs. The Hall land was unfenced, contained no shelter, and was not suitable winter range, though it probably was adequate as summer range. Stockmen usually assume that winter is ended by May 10, and that cattle may then be moved from their winter range to open land available for summer range. The cattle on May 8 were in good condition, and probably would have "got along all right" on the Hall land except for the storms and lack of shelter. There was testimony by experienced cattle men that the storms would have caused no losses, or no more than "normal" losses, if the cattle had remained on the Diamond land.

The jury were instructed that whether the loss of cattle in the storms "was naturally and proximately caused by the eviction" was a question for them to determine from all the evidence in the case. The storms were characterized as "a concurrent or intervening

cause" which, "unless it entirely supersedes the original act as the cause of the loss or injury," does not prevent the original act from remaining the proximate cause. (See Lemos v. Madden, 28 Wyo. 1, 17, 200 Pac. 791, 796.) Further, that in order to determine whether the loss of the cattle in the snow storms was the proximate result of the eviction, the jury should determine whether such a loss should have been "reasonably anticipated" by defendant at the time it caused plaintiff to leave the premises. It was explained that none of the damages claimed were the "direct" result of cancellation of the lease, but that in each case "an intervening cause" is shown, and that defendant would not be liable for any damages "thus indirectly sustained" unless they were the "natural and probable consequences" of the act of defendant which were "reasonably to be contemplated" at the time the notice of cancellation was given. It was further stated that the evidence for plaintiff indicates that the storms which were alleged to have been the immediate causes of the loss of cattle were "unusual" ones and not storms of ordinary occurrence at the season of the year when the loss occurred, and that defendant would in any case only be liable for the consequences of storms of such character that they should "reasonably have been anticipated or foreseen by the parties in January." The jury were told, further that "It was the duty of Clark to use every reasonable and natural effort to prevent or mitigate losses to him resulting from the termination of the lease. Unless the jury believe that Clark did this and that there were no means at his command or within his reasonable reach to prevent or diminish the losses of cattle, the jury should find for the defendant upon that issue. At all events, it was the duty of the Plaintiff to give such reasonable care and make such reasonable provision for the safety and welfare of his

cattle as persons of experience in like circumstances could reasonably be expected to give."

We do not purpose to try to add anything to the many discussions in recent years of the principles that should control in deciding what consequences of a wrongful act are too remote to be counted in allowing damages. We may assume for the purposes of the case that the instructions were correct in limiting defendant's liability to consequences of the kind that might reasonably have been anticipated or foreseen by defendant when it gave the false notice. If the instructions were taken to mean that the defendant was not liable unless it could have foreseen storms of the severity of those that actually happened, we believe they were too favorable to defendant.

We think defendant seeks to make too much of the fact that the storms which killed the cattle were described as unusual. Plaintiff had the right to the possession of the Diamond land and to the shelter there available as protection of his cattle during storms. The shelter was needed all the more if storms happened to be unusually severe. There could be no doubt that the cancellation of the lease caused plaintiff to lose the benefit of this shelter. Defendant in canceling the lease took the risk of plaintiff being unable to find another suitable place. Poposkey v. Munkwitz, 68 Wis. 322, 334, 32 N. W. 35. It is stated in Sedgwick on Damages (9th ed.) § 135 that "when a plaintiff has provided shelter for his person or his property and he is deprived of it by the defendant's wrong, the injury to the person or property caused by the lack of shelter or protection is the proximate consequence of the defendant's wrong." See Derry v. Flitner, 118 Mass. 131; McMahon v. Field, L. R., 7 Q. B. 591; Lange v. Wagner, 52 Md. 310; Haven v. Wakefield, 39 Ill. 509, 521. Storms are natural and may be foreseen. Big Goose etc. Co. v. Morrow, 8 Wyo. 537, 547, 59 Pac. 159. We think the

jury reasonably may have found that defendant should have anticipated that defendant's cattle deprived of shelter might be injured by storms. It was not important that it may not have anticipated unusual or extraordinary storms, or the extent of the damage that might be caused thereby. The extraordinary operation of a force of nature, which merely increased the harm to plaintiff which would otherwise have resulted from defendant's wrong, should not prevent defendant from being liable for such harm. Restat. Torts, § 450. The harm was of the kind likely to result from defendant's wrong, and defendant should not be relieved of responsibility on the ground of the intervening operation of the storms. Restat. Torts, § 451. See Bader v. Mills & Baker Co., 28 Wyo. 191, 200, 201 Pac. 1012; Lemos v. Madden, 28 Wyo. 1, 17, 200 Pac. 791.

A further contention bearing on the question of the remoteness of damages is that the loss of the cattle in the storms could have been avoided by reasonable precautions which it was the duty of plaintiff to take. Defendant asserts that the evidence shows that plaintiff had an opportunity to rent other land containing shelter for his cattle. Plaintiff's evidence tended to show that both he and an agent for Wolf Brothers tried to obtain other suitable land containing shelter, but were unable to find any. The only evidence to the contrary was to the effect that in April, 1933, defendant had a ranch which contained ample shelter and was not leased, and that Mrs. Bosler told plaintiff's wife and daughter that this ranch might be leased to plaintiff if suitable arrangements were made. Plaintiff's daughter testified that this offer was not considered; that the ranch had no fence between the pasture and meadow, and for that reason "would have done them no good." We cannot say that the jury were not justified in believing that the reason given was sufficient excuse for

plaintiff's failure to try to make arrangements for procuring this ranch.

It is also contended that plaintiff was guilty of negligence in moving his cattle on May 8 when a storm was threatened, and in failing to take proper care of the cattle during the storms.

We cannot hold that, as a matter of law, plaintiff's damage was attributable to his negligence, either in failing to procure sheltered land or in the handling of his cattle. The question was submitted to the jury by the above-quoted instruction, of which there is no complaint, and we do not think it can be held that the jury was not warranted in refusing to find that the plaintiff failed in his duty to use reasonable precautions to avoid the damage.

We hold, therefore, that the verdict for plaintiff for damages in the amount of $1952.50 found by the jury to be the value of the cattle lost in the storms cannot be disturbed. We do not think it necessary to extend this opinion, already too long, by a discussion of many other assignments of error that seem of minor importance. We must be content to say that their examination has not shown any error that would warrant a reversal of the judgment for the damage caused by the storms.

The judgment in so far as it holds defendant liable for $3217 as damage to the cattle remaining after the storms, is in our opinion not supported by the pleadings or the evidence. The petition did not allege that the storms caused any depreciation in the value of the cattle that survived. The theory was that defendant was responsible for damage caused by the sale of the cattle by Wolf Brothers for less than their market value. The evidence did not show to what extent the surviving cattle had been damaged, but only what they were worth when sold, and that they were sold for much less than their value. The special finding of the

jury on this item shows that the amount of damage was fixed by subtracting the sale price from the market price.

We have been cited to no authority giving a reason for holding that defendant should be held accountable for the action of Wolf Brothers in taking the cattle and selling them for less than they were worth. Several cases indicate, without much discussion, that such damages are remote. See Chandler v. Smith, 70 Ill. App. 658; Kammerer v. U. S. Silica Co., 196 Ill. App. 528; Casper v. Klippen, 61 Minn. 353, 63 N. W. 737; Robrecht v. Marling's Admr., 29 W. Va. 765, 2 S. E. 827; Wakin v. Morgan, 165 Ark. 234, 263 S. W. 783. We do not say that there is any principle of general application protecting a lessor from liability for damages suffered by his evicted tenant who is forced to sell personal property below its value. See Chapman v. Kirby, 49 Ill. 211, 218; Supplee v. Timothy, 124 Pa. 375, 386, 16 Atl. 864. In the case at bar the cattle were sold in December because the plaintiff was unable to make arrangements for carrying them through the winter. This was due largely, perhaps entirely, to plaintiff's financial embarrassment. See Liesbosch Dredger v. Edison S. S., [1933] A. C. 449, 460. The cattle were mortgaged for their full value; plaintiff was unable to borrow more; the mortgagee was unwilling to take the risk of having the cattle left longer in plaintiff's care, and, because of conditions for which defendant was not responsible, the cattle were sold for less than they were worth. We believe it is unreasonable to charge these consequences to defendant's wrongful act which deprived plaintiff of the shelter for his cattle in the preceding May. We hold, therefore, that this item of damage was too remote.

The case will be remanded with direction to modify the judgment by eliminating the amount assessed on account of damage caused by the sale of the cattle, and

the judgment, as so modified, is affirmed. Costs taxed in this court will be divided equally. No costs will be taxed for briefs.

BLUME, Ch. J., and RINER, J., concur.